[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15011

_____

D.C. Docket No. 9:13-cv-80577-DMM

MARY SUSAN PINE,
MARILYN BLACKBURN,

Plaintiffs - Appellants,

versus

CITY OF WEST PALM BEACH, FL,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 6, 2014)

Before MARCUS and ANDERSON, Circuit Judges, and GOLDBERG,[*] Judge.

MARCUS, Circuit Judge:

---

[*]  Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

Appellants Mary Susan Pine and Marilyn Blackburn advocate against abortion. They challenge on First Amendment grounds § 34-38 of the Code of the City of West Palm Beach (the "Sound Ordinance" or "Ordinance"), which bans amplified sound within 100 feet of the property line of any health care facility. The district court refused to preliminarily enjoin the City's enforcement of the Sound Ordinance, finding that the Appellants had not demonstrated a substantial likelihood of success on the merits of their constitutional claim.

On the record presented to this Court, the district court did not abuse its considerable discretion in refusing to issue a preliminary injunction when it found that the Sound Ordinance is a valid time, place, or manner restriction on speech that is content-neutral, is narrowly tailored to advance the City's substantial interest in protecting patients, and leaves open ample alternative avenues of communication. Nor did the district court abuse its discretion in determining that the Appellants failed to establish a substantial likelihood of success on their claims that the Ordinance is void for vagueness and is being applied discriminatorily against them. Accordingly, we affirm.

I.

For a number of years, Appellants and other advocates have participated in protests and counseling on public streets and sidewalks surrounding the Presidential Women's Center, a health care facility in West Palm Beach, Florida,

2

where doctors perform abortions. Pine and Blackburn verbally express their opposition to abortion, attempt to communicate with patients about abortion alternatives, and pray for the mothers and unborn children. In the past they have used electronic devices that produce sound, including megaphones (hand-held loudspeakers) and walkie-talkies (hand-held two-way radios). Appellants use the megaphones to attract the attention of visitors to the Center. The walkie-talkies facilitate prayer: the person praying speaks into one radio while others listen on additional devices. Appellants argue that because the property is surrounded by a wall and most visitors arrive by car they cannot communicate their message without sound amplification.

This case is the latest in a string of legal skirmishes between pro-life advocates and the City over ordinances restricting speech near the Center. In July 2005, an arson destroyed part of the Center. The City Commission held a meeting to address the issue and to explore possible ordinances that "would protect the safety of these patients that are going into this clinic." Halfpap v. City of W. Palm Beach, No. 05-80900-CIV, 2006 WL 5700261, at *4 (S.D. Fla. Apr. 12, 2006). At a later public hearing, the Commission heard from the long-time director of the Center, who described "[a]n escalation of an environment that becomes increasingly more hostile, increasingly more dangerous with the stopping of traffic, attempting to access the entrance to our facility. The tactics have been . . .

3

magnified with having megaphones as well as the use of video cameras to intimidate patients." Id. at *6. Other witnesses testified that people outside the clinic yelled and screamed and used megaphones to shout things that were audible from inside the clinic. One former patient explained that the commotion she experienced when she was being escorted into the building made her "[v]ery, very, very anxious."

In response, the City Commission passed two ordinances. The 2005 Buffer Ordinance, which is not before us, created a twenty-foot "buffer zone" around health facility driveways in which no one could protest, leaflet, or "engage in oral advocacy."[1] West Palm Beach, Fla., Code § 78-425(1) (2005). The 2005 Sound Ordinance, which is before this Court in an amended form, prohibited "amplified

---

[1] In its entirety, the 2005 Buffer Ordinance provided:

Sec. 78-425. Engaging in prohibited activities near health care facilities.

(1) No person shall engage in protesting, picketing, distributing leaflets or handbills, attempting to impede access, or engage in oral advocacy, education or counseling activities within a designated public safety buffer zone adjacent to a health care facility.

(2) "Designated Public Safety Buffer Zone" shall mean an area 20 feet around a health care facility's driveways and entrances from public rights-of-way or other public areas immediately adjacent to a health care facility.

(3) "Health Care Facility" means any facility that is licensed, certified, or otherwise authorized or permitted by law to administer treatment in this state.

West Palm Beach, Fla., Code § 78-425 (2005).

4

sound on any public street or sidewalk within 100 feet" of a health care facility.[2]

Id. § 34-38.

Pro-life advocates sued, claiming the two ordinances infringed their First

Amendment rights.  See Halfpap, 2006 WL 5700261.  The district court granted a

preliminary injunction concerning the Buffer Ordinance, finding that it restricted

speech in a quintessentially public forum and was not a narrowly tailored response

to a significant state interest.  Id. at *25.  However, the district court refused to

enjoin enforcement of the 2005 Sound Ordinance.  Though the court expressed

concern at the breadth of the ordinance's language, which applied to "any

unnecessary noise" as well as "amplified sound," it interpreted the ordinance to

avoid constitutional concerns by reading it to apply only to "amplified sound, i.e.,

---

[2] The 2005 Sound Ordinance provided:

> No person shall produce, cause to be produced, or allow to be produced, by any means, any unnecessary noise or amplified sound, operate or play any radio, phonograph, stereo set, tape or CD player, television, sound amplifier, or other electronic audio device that produces or reproduces amplified sound on any public street or sidewalk within 100 feet of any portion of a building housing a health care facility or any other institution reserved for the sick or infirmed [sic], provided that the public streets or sidewalks adjacent to such facilities shall be clearly marked by conspicuous signs identifying those areas.  "Health care facility" as used in this subsection, includes, but is not limited to, hospitals, physicians' offices, walk-in medical centers, medical diagnostic centers, surgical centers, and facilities which are licensed, certified or otherwise authorized to perform medical procedures in this state and to provide health services. "Health care facility" shall not include residential homes, convalescent homes or other facilities that provide long term residency.

Id. § 34-38 (2005).

5

megaphones or loudspeakers, devices that amplify the voice." Id. at *26.[3]  In 2008, the City Commission passed an amendment that removed the restriction on "any unnecessary noise" in order to make clear that the Sound Ordinance, § 34-38, prohibited only "amplified sound."[4]  In 2010, Appellant Pine was cited under the Sound Ordinance for using a bullhorn within the quiet zone surrounding the Center and was assessed a $250 fine.

In 2011, the West Palm Beach City Commission again took up the issue.  As other witnesses had in the past, a physician at a public hearing testified that stressful noise increases blood pressure and heart rate, which can cause complications and infections for patients undergoing medical procedures.  Dr. Jay Trabin explained that "the World Health Organization and a number of other surgical institutions around the country and the world have recognized noise pollution, as it's termed, as a significant risk factor in patient care."  He explained the scientific mechanism: "noise pollution, especially stressful noise pollution, causes the adrenal glands and other organs in the body to produce substances called catacholamines which, for all practical purposes, are things that increase

---

[3] Appellant Pine also in the past challenged an earlier version of the Sound Ordinance that prohibited amplified sound "at a level that is plainly audible at a distance of more than ten feet from the sound source."  Code § 34-38 (1979).  The district court found that the provision was unconstitutional because it was not narrowly tailored.  Pine v. Presidential Women's Center, Inc., No. 04-80123-CIV-ZLOCH, slip op. at 30 (S.D. Fla. Nov. 1, 2007).

[4] The 2008 amendment also extended the prohibition on amplified sound within 100 feet of a health care facility to include sound produced on private property.

6

blood flow and increase heart rate and blood pressure . . . ." Dr. Trabin brought the Commission dozens of articles detailing medical studies that found "such stress hormones decrease patient healing," "increase patient healing time," "and increase the need for anesthesia and for sedation." Together, he concluded, these factors "lead to increased complication rates, possibly increased infection and an overall less satisfactory experience."

A City Commissioner stated, "[w]e are not infringing on a person's right of free speech. What we are doing is -- and we have substantial testimony in our record that says that amplified noise and noise that impacts upon a person going through any medical procedure can damage their health." After the 2011 hearing, the Commission amended § 34-38 to prohibit amplified sound produced within 100 feet of the property line of a health care facility, not the building itself. The 2011 amendment also banned shouting and specified that amplified sound included loudspeakers and drums. "Amplified sound" is defined elsewhere in the Code as "a sound augmented by any electronic or other means that increases the sound level or volume." Code § 34-34. "Shouting" is "[a]ny reasonably loud, boisterous or raucous shouting in any residential area or within a quiet zone." Id. § 34-35(12). The 2011 version of the Sound Ordinance, which remains in force today and is challenged by Appellants in this case, provides:

Sec. 34-38. -- Sound limitations for health care facilities.

7

(a) <u>Purpose</u>.  The purpose of these regulations is to create an area surrounding health care facilities that is quiet and free from shouting or other amplified sound.

(b) <u>Limitations</u>.  No person shall shout or, cause to be produced, or allow to be produced, by any means, any amplified sound, including a loudspeaker, drum, radio, phonograph, stereo set, tape or CD player, television, sound amplifier, or other electronic audio instrument or device that produces or reproduces amplified sound on any public street or sidewalk or from private property within 100 feet of the property line of a property housing a health care facility or any other institution reserved for the sick or infirmed, provided that the public streets or sidewalks adjacent to such facilities shall be clearly marked by conspicuous signs identifying those areas.  "Health care facility" as used in this subsection, includes, but is not limited to, hospitals, physicians' offices, walk-in medical centers, medical diagnostic centers, surgical centers, and facilities which are licensed, certified or otherwise authorized to perform medical procedures in this state and to provide health services.  "Health care facility" shall not include residential homes, convalescent homes or other facilities that provide long term residency.  Any health care facility that identifies the facility as being located in a quiet zone in accordance with subsection (c) below shall be subject to the same limitations on amplified sound described in this section within 100 feet of the property line of a property housing such health care facility.

(c) <u>Signage required</u>.  It shall be the duty of each health care facility or owner of such establishment to erect and maintain lampposts or signs in some conspicuous place on every street, avenue or alley in the vicinity of every health care facility, public or private, indicating that the same is a "Quiet Zone."  The signs which must meet and conform to the city's sign code shall be placed on such streets, avenues or alleys upon which a health care facility is situated and shall read in a manner similar to, but not restricted to, the following:
"Hospital -- Quiet Zone" or "Health Care Facility -- Quiet Zone."

<u>Id.</u> § 34-38.

8

On June 6, 2013, Appellants Pine and Blackburn filed a verified complaint in the United States District Court for the Southern District of Florida challenging the constitutionality of the Sound Ordinance both on its face and as applied to their activities near the Center.  They sought a declaratory judgment, preliminary and permanent injunctive relief, and compensatory damages.  On October 29, 2013, the district court denied Appellants' motion for a preliminary injunction, finding that they had not shown a substantial likelihood of success on the merits because the Sound Ordinance imposes a reasonable restriction on the time, place, or manner of protected speech in a public forum.  The court concluded that the Ordinance is content-neutral, that it is narrowly tailored to the government's substantial interest in protecting patients from unwelcome noise, and that the Ordinance leaves open other effective avenues of communication.  In addition, the district court held that the City is not discriminatorily enforcing the Ordinance by failing to cite fast-food restaurants that use intercom systems within the 100-foot perimeter or by allowing the Center to use its own speakers, which are part of a security system that falls within an Ordinance exemption.[5]  Finally, the district court held that the Ordinance is not void for vagueness because "[m]en of common intelligence would understand the Ordinance's meaning and would not differ as to its application."

---

[5] The City's Code exempts a number of uses and activities from the Sound Ordinance, including: cries for emergency assistance; sirens on emergency response vehicles; parades and events with appropriate permits; authorized activities on school or municipal property; fire and burglar alarms; trains, aircraft, cars, and boats; and noises resulting from emergency work.  Code § 34-40.

Appellants filed a timely notice of appeal. We have jurisdiction to hear this interlocutory appeal of the district court's order denying injunctive relief under 28 U.S.C. § 1292(a)(1). Appellants moved this Court for an injunction pending their appeal. We denied the motion.

## II.

We review the district court's decision to deny a preliminary injunction for abuse of discretion. Forsyth Cnty. v. U.S. Army Corps of Eng'rs, 633 F.3d 1032, 1039 (11th Cir. 2011). We review the court's findings of fact for clear error and its legal conclusions de novo. Id. "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1226 (11th Cir. 2005) (per curiam).

A party that seeks a preliminary injunction must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). "[A] preliminary injunction is an extraordinary and drastic remedy not to be

10

granted unless the movant clearly established the 'burden of persuasion' for each prong of the analysis." Am.'s Health Ins. Plans v. Hudgens, 742 F.3d 1319, 1329 (11th Cir. 2014) (quoting Siegel, 234 F.3d at 1176).  In this case, we need go no farther than the first prong of this analysis because Appellants cannot show a substantial likelihood of success on the merits.

### A.

Appellants first challenge the Sound Ordinance as unconstitutional on its face.  In a public forum -- such as the City streets and sidewalks involved in this case -- the government may impose reasonable restrictions on the time, place, or manner of protected speech, so long as the restrictions "[1] are justified without reference to the content of the regulated speech, . . . [2] are narrowly tailored to serve a significant governmental interest, and . . . [3] leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).  Appellants need only establish a significant likelihood that the Ordinance fails at one of these steps to demonstrate a substantial likelihood of success on the merits.  Because the parties do not dispute that the Sound Ordinance is content neutral, we examine the second and third prongs.

### 1.

11

In its Code, the City claims a "substantial interest in protecting its citizens from unwelcome noise" and "in preserving quiet in areas surrounding health care facilities." Code § 34-32(c),(f).  The district court found that the City indeed has substantial interests in protecting citizens and the area surrounding health care facilities from unwelcome noise.  We agree that these interests are significant.  The government "ha[s] a substantial interest in protecting its citizens from unwelcome noise.'" Ward, 491 U.S. at 796 (quoting City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 806 (1984)). While this interest is at is greatest when it concerns "'the well-being, tranquility, and privacy of the home,' . . . the government may act to protect even such traditional public forums as city streets and parks from excessive noise." Id. (quoting Frisby v. Schultz, 487 U.S. 474, 484 (1988)).

The City's interest in regulating sound near health care facilities and institutions for the sick or infirmed is all-the-more important because it is concerned with protecting patients who, according to medical testimony, could suffer serious physical damage from excess noise.  "Persons who are attempting to enter health care facilities -- for any purpose -- are often in particularly vulnerable physical and emotional conditions." Hill v. Colorado, 530 U.S. 703, 729 (2000). And "[n]oise control is particularly important around hospitals and medical facilities during surgery and recovery periods." Madsen v. Women's Health Ctr.,

12

Inc., 512 U.S. 753, 772 (1994); see NLRB v. Baptist Hosp., Inc., 442 U.S. 773, 783-784, n.12 (1979) ("Hospitals, after all, are not factories or mines or assembly plants.  They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere . . . ." (citation omitted)); Medlin v. Palmer, 874 F.2d 1085, 1090 (5th Cir. 1989) (recognizing "a legitimate governmental interest in protecting patients of hospitals and clinics from the unwarranted intrusion of amplified sound generated by 'pro-life' activists").

To be valid, a time, place, or manner restriction also must be narrowly tailored to advance the government's substantial interest.  "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"  McCullen v. Coakley, 134 S. Ct. 2518, 2535 (2014) (quoting Ward, 491 U.S. at 799).  "Such a regulation, unlike a content-based restriction of speech, 'need not be the least restrictive or least intrusive means of' serving the government's interests."  Id. (quoting Ward, 491 U.S. at 798).  "But the government still 'may not regulate expression in such a manner that a substantial

13

portion of the burden on speech does not serve to advance its goals.'" Id. (quoting Ward, 491 U.S. at 799).

Petititoners argue that we should apply the narrow tailoring formulation described by Justice O'Connor in Frisby: "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." 487 U.S. at 485. Since Ward, however, the Supreme Court has applied a less strenuous test: "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." 491 U.S. at 800. Indeed, in its recent decision in McCullen, the Supreme Court applied the Ward standard by asking whether a regulation was substantially more burdensome than necessary. See McCullen, 134 S. Ct. at 2537 ("The buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests.").

To decide whether the Sound Ordinance is narrowly tailored, we are obliged to identify what speech it restricts. The Sound Ordinance states that no person, within 100 feet of a health care facility's property line, "shall shout" or produce "any amplified sound, including a loudspeaker, drum, radio, phonograph, stereo set, tape or CD player, television, sound amplifier, or other electronic audio instrument or device that produces or reproduces amplified sound." Code § 34-

14

38(b).  From this language, Appellants argue that the Ordinance fails the narrow tailoring test because it bans all amplified speech.  We agree that grave constitutional questions would arise were we to interpret the Sound Ordinance to prohibit all devices that in any way electronically produce or increase the volume of sound.  Thus, for example, if a passerby carries on a subdued telephone conversation, the sound from her cellphone has negligible or no effect on patient health.  For the same reason, a law that reaches a person listening to music through headphones, or a nearby neighbor watching television at a normal level in his home, stretches well beyond what is needed to safeguard the sick.

But we do not look to statutory terms in isolation; instead, we consult context to determine meaning.  See Abramski v. United States, 134 S. Ct. 2259, 2267 n.6 (2014)  ("[A] court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context.").  After all, "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme -- because the same terminology is used elsewhere in a context that makes its meaning clear . . . ."  United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988).

In addition, when one interpretation of a law raises serious constitutional problems, courts will construe the law to avoid those problems so long as the

15

reading is not plainly contrary to legislative intent. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575 (1988); Hooper v. California, 155 U.S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."). When faced with more than one plausible interpretation of a law, then, we apply "the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts." Clark v. Martinez, 543 U.S. 371, 381 (2005); accord Rust v. Sullivan, 500 U.S. 173, 190 (1991) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." (quoting Blodgett v. Holden, 275 U.S. 142, 148 (1927) (opinion of Holmes, J.))). Florida courts also apply the canon of constitutional avoidance when interpreting state and local laws. See Hershey v. City of Clearwater, 834 F.2d 937, 940 n.5 (11th Cir. 1987) ("According to Florida (and general) rules of statutory construction, 'when reasonably possible, a statute should be construed in such a manner as to avoid conflict with the Constitution.'" (quoting Schultz v. State, 361 So. 2d 416, 418 (Fla. 1978))); State v. Mozo, 655 So. 2d 1115, 1117 (Fla. 1995) ("[W]e adhere to the settled principle of constitutional law that courts should endeavor to implement the legislative intent of statutes and avoid constitutional issues.").

16

To avoid serious constitutional concerns, and in the light of surrounding sections of the City's noise control regulations, we construe the Sound Ordinance as targeting only loud, raucous, or unreasonably disturbing noise. At least three other Code provisions support this reading. First, the stated purpose of the regulations explains the need for limits on noise at elevated levels. Section 34-31 states that the rules were designed to "reduc[e], control, and prevent[] . . . loud and raucous noise, or any noise which unreasonably disturbs, injures, or endangers the comfort, repose, health, peace, or safety of the city's inhabitants and visitors." Code § 34-31. In § 34-32, the City further found that (a) "[l]oud and raucous noise degrades the environment of the city to a degree that . . . [b]oth causes and aggravates health problems"; (b) "[b]oth the effective control and the elimination of loud and raucous noise are essential to the health and welfare of the city's inhabitants and visitors"; (d) "sound amplification equipment creates loud and raucous noise that may, in a particular manner and at a particular time and place, substantially and unreasonably invade the privacy, peace, and freedom of inhabitants of, and visitors to, the city"; and (f) "the city has a substantial interest in preserving quiet in areas surrounding health care facilities." Id. § 34-32 (emphases added). In other words, the City concluded that health problems are linked to loud and raucous noise and that certain types of amplified sound are unreasonably disturbing in certain settings. The City's stated purpose strongly

17

signals that the Sound Ordinance applies only to loud, raucous, or otherwise unreasonably disturbing noise.

In addition, § 34-34 defines "[a]mplified sound" for purposes of the noise control regulations as "a sound augmented by any electronic or other means that increases the sound level or volume." Id. § 34-34. The fact that the Sound Ordinance targeted amplified sound at an augmented or increased noise level, and did not refer to all electronically transmitted noise, strongly suggests that volume was at the heart of the City's concerns.

Finally, a parallel code restriction that also bans amplified sound and shouting applies only to "unreasonably loud, excessive, unnecessary or unusual noise." Id. § 34-35. Section 34-35 enumerates a dozen non-exclusive examples of offending noise, including the use of "any radio receiving set, television set, musical instrument, phonograph, or other machine or device for the producing or reproducing of sound in such manner as to disturb the peace, quiet and comfort of the neighboring inhabitants." Id. Section 34-35 also addresses loudspeakers, proscribing vehicles with an attached "sound amplifier or radio or any other instrument of any kind or character which emits therefrom loud and raucous noises" in public or within a § 34-38 quiet zone. Id. Section 34-35 further bans "[a]ny unreasonably loud, boisterous or raucous shouting in any residential area or within a quiet zone established pursuant to section 34-38." Id.

18

Thus, § 34-35 explained that shouting and amplified sound were prohibited insofar as they were unreasonably loud, raucous, or disturbing.  In turn, the Sound Ordinance, § 34-38, addressed the use of "shouting or other amplified sound" near health care facilities.  Id. § 34-38.  Read in context, and through the prism of our canon of constitutional avoidance, the City's noise control regulations indicate that the Sound Ordinance restriction on amplified sound applies only to "loud and raucous noise, or any noise which unreasonably disturbs, injures, or endangers the comfort, repose, health, peace, or safety" of others within a health care facility quiet zone.  Id. § 34-31.[6]

Interpreting the Sound Ordinance to limit only excessive amplified noise also avoids an odd or absurd outcome.  "Where the literal reading of a statutory

---

[6] Reading the Sound Ordinance to extend only to loud, raucous, or otherwise unreasonably disturbing noise does not make § 34-38 unnecessary or redundant in the light of the general § 34-35 noise restrictions.  Section 34-38 calls the attention of government officials and the community to the City's particular interest in regulating sound in quiet zones where patients may be affected.  Moreover, § 34-38 highlights the importance of context: noise that may be innocuous in a busy commercial area might be unreasonably disturbing when produced near a health care facility.

Moreover, Appellants' invocation of the "specific governs the general" canon of construction is misplaced.  That interpretive tool is helpful when "a general permission or prohibition is contradicted by a specific prohibition or permission."  RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012).  Here, the issue is not whether a specific or a general rule applies; instead, the relevant question is the meaning of "amplified sound" in § 34-38.  As explained, we interpret the meaning of that term by looking to context provided by the Code.

Appellants also argue that we cannot adopt a limited interpretation of the Sound Ordinance because the City has been broadly interpreting it when putting it into practice.  As we have explained, however, the language and context of the City's noise control regulations and the principle of constitutional avoidance dictate our narrower reading.

19

term would 'compel an odd result,' we must search for other evidence of [legislative] intent to lend the term its proper scope." Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 454 (1989) (quoting Green v. Bock Laundry Machine Co., 490 U.S. 504, 509 (1989)); see Church of the Holy Trinity v. United States, 143 U.S. 457, 459 (1892) ("[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."). If we interpret the Sound Ordinance to the broadest degree allowed by the text, it would bar anyone within 100 feet of health facility property from using any electronic audio instrument, whether with headphones or an external speaker, regardless of the amount of sound produced or its potential effect on others. This expansive ban apparently would prohibit health care facilities from using any electronic equipment that uses or produces amplified sound, from paging systems to administrators' telephones to patient monitoring devices. Even an ultrasound scan amplifies sound, as does a stethoscope. Confining the Sound Ordinance to loud, raucous, or unreasonably disturbing noise -- terms used specifically in the Code -- avoids a profoundly far-reaching restriction no legislator could have intended.

20

Read this way, we have little doubt that the Sound Ordinance is narrowly tailored to advance the City's interest in protecting patient health in areas near health care facilities and institutions for the sick or infirmed. Because the offending sound itself is the potential cause of harm, the Sound Ordinance is "not substantially broader than necessary to achieve the government's interest." Ward, 491 U.S. at 800. Indeed, the Sound Ordinance closely resembles noise limits long ago upheld by the Supreme Court:

> City streets are recognized as a normal place for the exchange of ideas by speech or paper. But this does not mean the freedom is beyond all control. We think it is a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of municipalities. On the business streets of cities . . . , such distractions would be dangerous to traffic at all hours useful for the dissemination of information, and in the residential thoroughfares the quiet and tranquility so desirable for city dwellers would likewise be at the mercy of advocates of particular religious, social or political persuasions. We cannot believe that rights of free speech compel a municipality to allow such mechanical voice amplification on any of its streets.

Kovacs v. Cooper, 336 U.S. 77, 87 (1949). Moreover, not every instance of loud, raucous, or unreasonably disturbing sound in a quiet zone must harm patient health for the Ordinance to be narrowly tailored. Instead, the Sound Ordinance does not burden substantially more speech than necessary because the prohibited types of noise heighten the risk that patients will suffer deleterious health effects. Cf. Hill, 530 U.S. at 707-08 (upholding against a First Amendment challenge a Colorado

21

statute that "forbids all unwelcome demonstrators to come closer than eight feet" because, although it "will sometimes inhibit a demonstrator whose approach in fact would have proved harmless," the "bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself").

This case raises issues sharply different from those addressed recently by the Supreme Court in McCullen.  There, the Supreme Court struck down a Massachusetts law that prohibited activists from standing within thirty-five feet of the driveway or entrance of a reproductive health care facility.  McCullen, 132 S. Ct. at 2525, 2541.  For a number of reasons, the Court held that the restriction was not narrowly tailored to the government's interest in preventing obstructions and congestion outside of abortion clinics.  Id. at 2537-41.  The Court explained that the Massachusetts law "unnecessarily swe[pt] in innocent individuals and their speech" by "categorically exclud[ing] non-exempt individuals from the buffer zones."  Id. at 2538.  Notably, Massachusetts had failed to pursue a variety of available, less-restrictive solutions for congestion problems.  Finally, the law barred access to public sidewalks and ways, "areas historically open for speech and debate."  Id. at 2539.  Massachusetts had taken "the extreme step of closing a substantial portion of a traditional public forum to all speakers."  Id. at  2541.

22

These considerations cut the other way in this case. Instead of casting a wide net that captures innocent speech, the Sound Ordinance targets only actions near health care facilities that produce types of noise that can endanger patients. In addition, here there are no less restrictive means: because the heart of the problem is loud, raucous, or disturbing noise, a restriction on that sound is narrowly tailored. Unlike in McCullen, the record here contains no evidence of feasible alternatives that protect patient health from such sound. Finally, the Sound Ordinance in no way prevents Petitioners from accessing public ways and sidewalks near the Center. They simply cannot create loud, raucous, or unreasonably disturbing noise while there.

Petitioners also argue that we are bound to enjoin the Sound Ordinance by the former Fifth Circuit's decision in Reeves v. McConn, 631 F.2d 377 (5th Cir. 1980).[7] We remain unpersuaded. Reeves invalidated as unconstitutionally overbroad a Houston ordinance prohibiting all sound amplification within 100 yards of residences, schools, courthouses, hospitals, and churches. Id. at 388. Reeves explained that "there can be no valid state interest in prohibiting all sound amplification within 100 yards of schools, courthouses, and churches outside the normal hours of use." Id. at 385. Reeves further found "no valid state interest in prohibiting amplified sound that does not actually cause, or imminently threaten to

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

23

cause, material disruption at" a residence or hotel.  Id.  Notably, Reeves said nothing about the state's interest in restricting sound near hospitals.  Ultimately, then, Reeves does not control the outcome of this case because its overbreadth analysis did not specifically address whether the restriction on amplified sound near hospitals was problematic.  Instead, Reeves made clear that a "city may reasonably prohibit kinds or degrees of sound amplification that are clearly incompatible with the normal activity of certain locations at certain times."  Id. at 388.  The City of West Palm Beach has done just that.

2.

"While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."  Taxpayers for Vincent, 466 U.S. at 812 (citation omitted).  Here, the district court found that the Sound Ordinance left open meaningful alternative means of communication.  The court followed the approach employed by the Fifth Circuit in Medlin, in which a local ordinance targeted "the use of amplified sound in close proximity to certain institutions such as hospitals."  874 F.2d at 1090.  The Fifth Circuit held that the restriction left open sufficient alternative channels because "[i]t does not prohibit unamplified speech.  It does not prohibit the

24

distribution of written material.  It does not prohibit the display of signs and placards nor does it prohibit any symbolic speech."  Id.

For many of the same reasons cited by the Fifth Circuit in Medlin, we conclude that the Sound Ordinance leaves open robust alternative channels of communication.  As the district court found, Appellants "are still free to talk, sing, hold up signs, and distribute literature to patients within the quiet zone."  They "may still use amplified sound anywhere outside the quiet zone" because the Sound Ordinance applies only to sound produced within a quiet zone, not noise that can be heard there.  Importantly, the ordinance in no way restricts the use or display of signs or the distribution of literature, thereby providing reasonable alternative modes of communication.  See Hill, 530 U.S. at 726 (upholding a restriction on approaching others near health facilities because "[t]he 8-foot separation between the speaker and the audience should not have any adverse impact on the readers' ability to read signs displayed by demonstrators. . . . Furthermore, the statute places no limitations on the number, size, text, or images of the placards.  And . . . the 8-foot zone does not affect demonstrators with signs who remain in place").

Appellants argue, nevertheless, that they must gain the attention of patients to let them know literature and counseling is available.  But they offer no persuasive account of why signs, the distribution of literature, or other means -- not

25

involving loud, raucous, or otherwise unreasonably disturbing noise -- cannot accomplish that goal.  As the district court observed, "[t]hat patients entering the Clinic chose to ignore them does not mean that Plaintiffs' right to communicate effectively is infringed or that the instant Ordinance is unconstitutional."  The long and the short of it is that Appellants retain substantial alternative avenues to express their views.

Construed narrowly to avoid constitutional concerns, the Sound Ordinance prohibition on loud, raucous, or other unreasonably disturbing amplified noise is a valid time, place, or manner restriction because it is content neutral, is narrowly tailored to advance a substantial government interest, and leaves open alternative channels of communication.  The district court did not abuse its discretion in determining that Appellants have failed to establish a substantial likelihood of success on the merits of their facial challenge.

### III.

Appellants also argue that the Sound Ordinance is unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  The Supreme Court has identified three values driving the vagueness doctrine.  First, "[v]ague laws may trap the innocent by not providing fair warning."  Id.  Moreover, vague laws impermissibly delegate policy decisions to

26

police, judges, and juries, which risks "arbitrary and discriminatory application." Id. at 109.  Finally, vague prohibitions that implicate First Amendment freedoms risk chilling more speech than necessary.  Id.  As a result, "we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  Id. at 108.  Still, "we can never expect mathematical certainty from our language."  Id. at 110.

The Sound Ordinance is not unconstitutionally vague because it squarely gives fair notice to those who may be affected.  As we've explained, its context indicates that it prohibits only shouting and loud, raucous, or unreasonably disturbing amplified noise near health care facilities or institutions for the sick.  Cf. id. at 112 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted.  We do not have here a vague, general 'breach of the peace' ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school.").

Indeed, in 1949 the Supreme Court upheld a prohibition on "loud and raucous" sound as sufficiently definite and clear.  Kovacs, 336 U.S. at 79.  According to the Court, "[w]hile these are abstract words, they have through daily use acquired a content that conveys to any interested person a sufficiently accurate

27

concept of what is forbidden." Id.  Those words remain sufficiently clear sixty-

five years later.  Read in a limited way to avoid constitutional concerns, the

Ordinance here, banning only amplified sound that is loud or raucous, or that

unreasonably disturbs, injures, or endangers the comfort, repose, health, peace, or

safety of others within a health care facility quiet zone, is not impermissibly vague.

See, e.g., Reeves, 631 F.2d at 386 (finding no vagueness problem with an

ordinance restricting amplified sound that is "unreasonably loud, raucous, jarring,

disturbing, or a nuisance to persons within the area of audibility").  Appellants also

argue that the statute is vague because property lines are invisible.  But the

required health facility signs warn speakers about the existence of a quiet zone and

its rough boundaries.  All told, the City's noise control regulations give a person of

ordinary intelligence fair notice of what type of amplified sound is restricted.

## IV.

Finally, Appellants argue that the City has applied the Sound Ordinance in a

discriminatory manner based on their viewpoint.  Appellants complain that the

City has not applied the Sound Ordinance to limit the use of drive-through

loudspeakers within the quiet zone by quick-service restaurants Wendy's and Pollo

Tropical.  But these intercoms are not covered by the Ordinance so long as they do

not produce loud and raucous noise or unreasonably disturbing sound.  Similarly,

the Center's own security system, which includes loudspeakers that warn would-be

28

trespassers, is expressly exempted from the Sound Ordinance as an alarm under § 34-40.  The district court acted within its considerable discretion by concluding that "[t]he City is not selectively enforcing the Ordinance against pro-life advocates" when, to the City's knowledge, "[n]o other individuals are using bullhorns and other prohibit[ed] amplifiers in established quiet zones."  We reiterate, however, that this matter is before the Court only on the question of the "extraordinary and drastic remedy" of a preliminary injunction.  Hudgens, 742 F.3d at 1329.  On remand, Appellants remain free on a full record to pursue a permanent injunction and other relief.

      **AFFIRMED.**