**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1383**

ZACHARY HEBB,

        Plaintiff - Appellee,

v.

CITY OF ASHEVILLE, NORTH CAROLINA; BEN WOODY, individually and in his official capacity as Director of Development Services Department for City of Asheville, North Carolina,

        Defendants - Appellants.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:22-cv-00222-MR-WCM)

Argued:  January 31, 2025                    Decided:  July 23, 2025

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Wynn wrote the majority opinion, in which Judge King joined. Judge Quattlebaum wrote an opinion concurring in part and dissenting in part.

**ARGUED:**  Eric Patrick Edgerton, CITY OF ASHEVILLE CITY ATTORNEY'S OFFICE, Asheville, North Carolina, for Appellants.  Nathan W. Kellum, FIRST LIBERTY INSTITUTE, Memphis, Tennessee, for Appellee. **ON BRIEF:**  Brennan Tyler Brooks, THOMAS MORE SOCIETY, Chicago, Illinois; Jeffrey C. Mateer, FIRST LIBERTY INSTITUTE, Plano, Texas, for Appellee.

WYNN, Circuit Judge:

The City of Asheville appeals from the district court's orders enjoining enforcement of a municipal ordinance that prohibits the use of amplified sound within 150 feet of a medical clinic during its operating hours. The district court initially found that the ordinance likely infringed upon the rights of Plaintiff Zachary Hebb under the First and Fourteenth Amendments, and temporarily enjoined its enforcement. Notwithstanding Asheville's subsequent amendment to the ordinance, the court declined to dismiss the action and ultimately granted Hebb's motion for summary judgment, entering a permanent injunction and awarding nominal damages on his due process claim.

This appeal presents two questions: whether the district court properly denied Asheville's two motions to dismiss Hebb's First Amendment claim and instead granted summary judgment in Hebb's favor, and whether the district court properly determined that Hebb's Fourteenth Amendment due process claim was legally cognizable and that Hebb was entitled to summary judgment on that claim.

Upon review, we affirm the district court's denial of Asheville's motions to dismiss Hebb's First Amendment claim but conclude that the entry of summary judgment in Hebb's favor was premature in light of disputed factual and legal questions that warrant further consideration. As to Hebb's due process claim, we hold that it fails as a matter of law and remand with instructions to dismiss that claim.

2

I.

A.

Zachary Hebb asserts a constitutional right to direct his expressive views at individuals entering medical facilities. Specifically, in this matter, his targets are primarily women who seek medical care at the Planned Parenthood's Asheville Health Center, an outpatient women's health clinic. According to Hebb, the Health Center is the only provider of abortion services in western North Carolina.

In March 2019, Hebb took to public sidewalks near the Health Center to express his views about abortion. According to Hebb, holding up signs or handing out literature were "not very effective" ways to communicate his message. J.A. 10–11.[1] Instead, Hebb claims that the "most effective means of communication at [the Health Center] is oral speech." J.A. 11. And because Hebb "wants to be winsome and speak conversationally, not yell, and still be heard by individuals he is trying to reach," he prefers to use a sound amplifier. *Id.*

On June 26 and July 24, 2021, Asheville official Ben Woody (then director of the Development Services Department and soon to be Assistant City Manager) cited Hebb outside the Health Center for violating Section 10-83 of Asheville's municipal code, a noise ordinance.[2] Section 10-83(b) prohibits any person in a public space from creating a

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] *See* Asheville, N.C. Code of Ordinances § 10-83, https://codelibrary.amlegal.com/codes/ashevillenc/latest/asheville_nc/0-0-0-10570 [https://perma.cc/G7HT-SUC6]. Asheville adopts noise ordinances under the authority of N.C. Gen. Stat. § 160A-184, which provides that "[a] city may by ordinance regulate, restrict, or prohibit the production

"noise disturbance," a term defined in Section 10-82.[3] That definition involves several factors, including "[w]hether the noise has been enhanced in volume or range by any type of megaphone, amplifier, or other mechanical means." Asheville, N.C. Code of Ordinances § 10-82. In addition, Section 10-83(c) sets maximum decibel limits for "any sound originating from" different kinds of public spaces at different times of day. *Id.* § 10-83(c).

On July 27, 2021, the Asheville City Council adopted a new noise ordinance, Section 10-85. Section 10-85(2), the focus of this litigation, prohibits any person from "[p]roducing, or causing to be produced amplified sound within 150 feet of the property line of a public school where classes or other educational activities are occurring, or a medical clinic that is open or otherwise caring for patients."

Section 10-85 took effect on September 15, 2021. Days later, when Hebb's friend Allura Lightfoot spoke through an amplifier outside the Health Center, a city official informed her that using amplifiers within 150 feet of the Health Center was prohibited under the new ordinance. The official also informed Lightfoot that a plastic cone would

_____

or emission of noises or amplified speech, music, or other sounds that tend to annoy, disturb, or frighten its citizens."

[3] Section 10-82 defines a "noise disturbance" as "any sound or vibration which: (1) May disturb or annoy reasonable persons of normal sensitivities; or (2) Causes, or tends to cause, an adverse effect on the public health and welfare; or (3) Endangers or injures people; or (4) Endangers or injures personal or real property." Section 10-82 also provides that, "[t]o determine whether a noise constitutes a noise disturbance, the following factors incident to such noise are to be considered: (1) Whether the noise occurred during daytime or nighttime hours; (2) The noise's volume and intensity; (3) Whether the noise has been enhanced in volume or range by any type of megaphone, amplifier, or other mechanical means; (4) The frequentness and duration of the noise, and; (5) The nature and zoning of the area."

4

qualify as an amplifier. Hebb does not allege that he has attempted to use a plastic cone outside the Health Center since Section 10-85(2) took effect.

Hebb contends that, in practice, Section 10-85(2)'s amplification ban and Section 10-83(c)'s decibel limits combine to prevent him from communicating his messages to patients entering the Health Center without yelling, which would "undercut[] his message and purpose." J.A. 34.

B.

In October 2022, Hebb sued Asheville and Woody under 42 U.S.C. § 1983. Hebb alleged that Section 10-85(2) violates the Free Speech Clause of the First Amendment: on its face, as applied to plastic cones, and as applied to prohibit amplification on public property within the buffer zone but not on private property within the buffer zone. Hebb also alleged that the 2021 ordinance was unconstitutionally vague as applied to prevent him and others from speaking through plastic cones within the buffer zone, in violation of the Due Process Clause of the Fourteenth Amendment. Hebb sought declaratory relief, a permanent injunction against enforcement of Section 10-85(2), nominal damages for the past due process violation, and attorneys' fees.

Shortly after filing the complaint, Hebb moved for a preliminary injunction and Asheville subsequently moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim.

In February 2023, the district court denied Asheville's motion to dismiss and granted Hebb's motion for a preliminary injunction.[4] *See Hebb v. City of Asheville*, 655 F. Supp. 3d 388 (W.D.N.C. 2023). The district court found that the facts alleged in the complaint "raise[d] questions about whether [Asheville's] purported, content-neutral justification for the enactment of § 10-85(2) [was] genuine." *Id.* at 400. The court noted that the fact that Asheville "introduced the amplification ban into the amended noise ordinance only after receiving" public comments that "relate[d] to amplified speech outside the [Health Center]"—some of which "object[ed] to the content of the anti-abortion protestors' speech"—suggested that the City Council "enacted § 10-85(2) because they were concerned about amplified, pro-life speech outside the [Health Center] specifically, rather than amplified speech outside of medical clinics generally." *Id.* at 399. And in the district court's view, "the scope of § 10-85(2) [was] inconsistent with [Asheville's] purported justification for implementing the amplification ban." *Id.*

The district court further concluded that "even if § 10-85(2) was enacted with a content neutral justification, the amplification ban still fails even intermediate scrutiny because it is not narrowly tailored" to Asheville's stated purpose of "protecting patients from harmful noise" and "does not leave open ample alternative channels of communication as applied to [Hebb]." *Id.* at 400. The court explained that on the one hand, Section 10-85(2) "does not apply to amplification emanating from medical clinics'

---

[4] The district court also dismissed Hebb's claims against Woody in his individual capacity, pursuant to the parties' Rule 41 stipulation. *Hebb v. City of Asheville*, 655 F. Supp. 3d 388, 406 (W.D.N.C. 2023).

6

properties" and "seemingly does not apply to inpatient medical facilities." *Id.* at 401. But on the other hand, it "applies to all amplified speech within 150 feet of the property line of a medical clinic without regard as to whether that amplified speech is disruptive to patient care." *Id.* And the court found that Hebb had "alleged facts showing that, as applied to him, the amplification ban in § 10-85(2) does not leave [him] with ample alternative channels to communicate his message." *Id.* at 403–04.

The district court concluded that Hebb was likely to succeed on his as-applied vagueness challenge. According to the court, "[w]hether using a plastic cone *amplifies* sound by making it louder or stronger or merely *directs* sound in a certain direction presents a complex evidentiary question rooted in physics, and, therefore, it is unclear to people of ordinary intelligence whether § 10-85(2) applies to plastic cones." *Id.* at 404. After briefly analyzing the other preliminary injunction factors, the court granted Hebb's motion. *Id.* at 404–06. Asheville then filed an answer to the complaint.[5]

In August 2023, Asheville's City Council adopted minor amendments to its noise ordinances. The Council described these amendments as "non-substantive modifications" intended "to clarify . . . the scope and application of Section 10-85(2)." J.A. 116. Section 10-85(2) was amended to include the following sentence: "For purposes of clarity, it is expressly noted that this prohibition does not apply to sounds originating from public schools or medical clinics themselves, as such sounds are already subjected to decibel

---

[5] Asheville did not file an interlocutory appeal from the district court's order granting Hebb a preliminary injunction.

7

limitations under section 10-83 of the City Code." *Id.*; Asheville, N.C. Code of Ordinances § 10-85(2). Section 10-82 was amended to define "medical clinic" to include both inpatient and outpatient service providers, and "amplified sound" to mean "a sound augmented by any electronic or other means that increases the sound level or volume." *Id.* § 10-82.

In October 2023, Asheville moved to dissolve the preliminary injunction and to dismiss the matter as moot under Rule 12(b)(1). The city argued that any "ambiguities" in "the previous iteration of Section 10-85(2) . . . were removed by" the amendment. J.A. 110. Hebb, in turn, moved for summary judgment.

In March 2024, the district court denied Asheville's renewed motion to dismiss, granted Hebb's motion for summary judgment, and permanently enjoined enforcement of Section 10-85(2). *Hebb v. City of Asheville*, No. 1:22-cv-222, 2024 WL 1261205, at *14 (W.D.N.C. Mar. 25, 2024).

As to Hebb's First Amendment claims, the district court "conclude[d] as a matter of law" that Section 10-85(2), as amended, was "not narrowly tailored."[6] *Id.* at *11; *see id.* at *7–11. The court found the ordinance overbroad because it "applies without regard to the

---

[6] The district court continued to doubt the sincerity of Asheville's content-neutral justification, commenting that "a reasonable trier of fact could find that the Defendants have undertaken a thinly veiled and very clumsy attempt to dress up a content-based regulation as a content-neutral regulation designed for the protection of patients." *Hebb*, 2024 WL 1261205, at *11. However, viewing the evidence in the light most favorable to Asheville, it concluded that Asheville forecasted evidence sufficient for a reasonable factfinder to conclude that "the City enacted [Section 10-85(2)] to address the complaints regarding the *sound level* of activities outside of medical clinics," a content-neutral interest. *Id.* *8. The district court did not address whether the ordinance left Hebb with ample alternative channels of communication.

8

volume of the sound, or to whether the sound is *actually* loud, disruptive, or raucous." *Id.* at \*9. And it found the ordinance underinclusive because it "does not apply to amplified sound of comparable, or even greater, volume emanating from medical clinics themselves." *Id.* In the district court's view, "[t]his underinclusivity suggests that the ban does not substantially advance Defendants' stated interest in protecting recovering patients from noise of a harmful volume." *Id.*

In addition, the court found that Asheville did not forecast evidence "that Defendants seriously undertook to address the issue of excessive noise around medical clinics with less intrusive measures before resorting to a complete ban." *Id.* at \*10. According to the court, Asheville "could have used at least two less restrictive alternatives": Section 10-83(b)'s existing multi-factor test for identifying "noise disturbances," or "fixed decibel limits" like the ones in Section 10-83(c). *Id.* at \*10–11. In his affidavit in support of Asheville's renewed motion to dismiss, Woody offered reasons why these alternatives were inadequate, but the district court rejected those explanations as post-hoc justifications. *Id.* at \*11; *see* J.A. 114–15.

The court also concluded that the 2021 version of the ordinance, which did not define the term "amplified sound," was unconstitutionally vague as applied to prevent Hebb from using a plastic cone. *See Hebb*, 2024 WL 1261205, at \*12–13. (In moving for summary judgment, Hebb did not raise a due process challenge to the 2023 version of the ordinance. *See id.* at \*12 n.9.) The court reiterated that, in its view, it is "unclear to people of ordinary intelligence" whether "using a plastic cone *amplifies* sound by making it louder

9

or stronger or merely *directs* sound in a certain direction." *Id.* at \*13. The court awarded Hebb nominal damages on his due process claim.

Finally, the district court permanently enjoined Asheville from enforcing Section 10-85(2). Asheville timely appealed.

## II.

Asheville appeals the denial of its two motions to dismiss and the grant of summary judgment to Hebb. Because the grant of summary judgment is a final order, we have jurisdiction under 28 U.S.C. § 1291. And because "an appeal from a final judgment permits review of all rulings that led up to the judgment," the district court's denials of Asheville's two motions to dismiss merge into its final order. *Gowen v. Winfield*, 130 F.4th 162, 172 (4th Cir. 2025) (citation omitted).

We review appeals of orders on motions to dismiss and summary judgment de novo. *Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021). In reviewing a motion to dismiss, we accept the complaint's factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). In reviewing a motion for summary judgment, we draw "all justifiable inferences" in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Summary judgment is only appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law.'" *Martin v. Duffy*, 977 F.3d 294, 298 (4th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).

10

III.

We begin with Hebb's First Amendment claim, as to which the district court denied Asheville's motions to dismiss and granted Hebb's motion for summary judgment. We affirm as to Asheville's motions to dismiss but reverse as to Hebb's motion for summary judgment.

A.

We evaluate First Amendment speech-suppression claims under a burden-shifting framework. "[T]he plaintiff bears the initial burden of proving that speech was restricted by the governmental action in question." *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) (citation omitted). "After the plaintiff makes his initial showing, the burden then falls on the government to prove the constitutionality of the speech restriction" under the appropriate level of scrutiny (here, intermediate scrutiny). *Id.* Although "the existence of a governmental interest may be established by reference to case law," and "objective evidence is not always required to show that a speech restriction furthers the government's interests," "intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden."[7] *Id.* at 228–29.

---

[7] Hebb seeks to express his beliefs on sidewalks and public rights-of-way, which are traditional public fora. But "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open

11

Asheville's first motion to dismiss contended that Hebb failed to state a First Amendment claim under Rule 12(b)(6). But we agree with the district court that Hebb carried his initial burden: the complaint alleges that Hebb would speak through an amplifier in a public forum—conduct plainly within the scope of the Free Speech Clause—but for Section 10-85(2)'s prohibition. And we agree with the district court that Asheville failed to show that the ordinance withstands intermediate scrutiny. As part of the narrow-tailoring prong of that analysis, Asheville had to show that its ordinance did not burden substantially more speech than necessary and that it tried to address the problem through less speech-restrictive means. *Reynolds*, 779 F.3d at 231; *see Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). These showings required "actual evidence"; "argument unsupported by the evidence" is not enough. *Reynolds*, 779 F.3d at 229. Asheville did not carry that burden on the pleadings; its arguments on these points rely heavily on affidavits and other materials submitted in support of its motions to dismiss and in opposition to Hebb's motion for summary judgment. Accordingly, we affirm the district court's denial of Asheville's first motion to dismiss as to Hebb's First Amendment claim.

Asheville's second motion to dismiss invoked mootness under Rule 12(b)(1). But we agree with the district court's conclusion that Asheville's minor changes to its noise ordinances "do not address the essence of [Hebb's] free speech claim because the [revised

---

ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see Am. Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 609 (4th Cir. 2001). These requirements are known as "intermediate scrutiny." *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014).

12

ban] still prohibits the use of amplified sound within 150 feet of open medical clinics, just as the [original ban] did." *Hebb*, 2024 WL 1261205, at *6; *see Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). Accordingly, we affirm the district court's denial of Asheville's second motion to dismiss as to Hebb's First Amendment claim.

## B.

Regarding Hebb's motion for summary judgment on his First Amendment claim, we disagree with the district court's conclusion that, upon viewing the facts in the light most favorable to Asheville, as a matter of law, Section 10-85(2) is not narrowly tailored to a significant government interest. Instead, for the reasons given below, we hold that, when viewed in the light most favorable to Asheville, the record suggests that Asheville's ordinance is content-neutral; that the ordinance is narrowly tailored to a significant government interest; and that it leaves Hebb with ample alternative channels of communication. Accordingly, we reverse the grant of summary judgment to Hebb on his First Amendment claim.[8]

## 1.

We first consider whether Asheville's ordinance is content-neutral. We evaluate the content neutrality of a speech regulation in two steps. First, we ask whether the regulation is facially content-based. A facially content-based regulation "applies to particular speech

---

[8] As previously noted, Asheville did not move for summary judgment. Accordingly, we address only the issue before us: whether *Hebb* is entitled to summary judgment when the facts are viewed in the light most favorable to Asheville.

because of the topic discussed or the idea or message expressed" or "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "[A]t the first step, the government's justification or purpose in enacting the law is irrelevant." *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015). Second, even a facially content-neutral regulation "will be considered content-based" if it "cannot be 'justified without reference to the content of the regulated speech,' or [was] adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

As the district court recognized, "both versions of the [amplification] ban are facially content neutral." *Hebb*, 2024 WL 1261205, at *7. The ordinance "places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by a speaker." *Hill v. Colorado*, 530 U.S. 703, 723 (2000). It "applies equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries"—to protestors of medical clinics that offer abortions and to protestors of medical clinics that offer crisis pregnancy support or deny gender-affirming care—in short, to any and all amplified messages originating within 150 feet of a medical clinic. *Id.*

Hebb does not argue that Section 10-85(2) is facially content-based. Instead, he contends, at step two of the content-neutrality inquiry, that Asheville's true "motivation for the ordinance is to aid [the Health Clinic] in silencing anti-abortion views." Response Br. at 24; *see* J.A. 7 ¶ 2.

14

Hebb offers no direct evidence for that claim. While proposing the 150-foot buffer zone to the City Council, Woody explained that schools and health care facilities "are places where services are happening and quiet is important for those services." J.A. 22.[9] Hebb acknowledges that "Woody did not supply any more information or reasoning or basis for inserting the new 150-foot amplification ban into the noise ordinance." *Id.* And the statements, emails, and other exhibits Hebb filed in support of summary judgment do not demonstrate city officials' intent to stifle anti-abortion viewpoints. On the contrary, Woody's emails with the Health Center indicate that he supported establishing a buffer zone because it would "make[] enforcement in these areas much easier for city staff, and provide[] much needed sound relief to certain land uses." J.A. 248.

Asheville, on the other hand, offers Woody's sworn statement, given in his official capacity as Assistant City Manager, that the amplification ban was enacted "to protect medical patients from harmful noise" and "was in no way motivated by a desire to prevent [Hebb] from expressing his views regarding the Asheville Health Center or its patients." J.A. 348. Asheville also explains that it received 62 noise complaints from the area around the Asheville Health Center in the eight years before it enacted Section 10-85(2), most of which related to volume, not content. *See Hebb*, 2024 WL 1261205, at *8.

Lacking direct evidence of censorious intent, Hebb resorts to inference. He argues that Section 10-85(2)'s over- and under-inclusivity proves that Asheville's proffered

---

[9] *See* City of Asheville, *City Council Meeting – June 22, 2021*, at 24:30 (YouTube, June 22, 2021), https://www.youtube.com/live/g5to6WxyrV0 [https://perma.cc/2FMR-6ZQG].

15

content-neutral interest is not genuine. If it were, Hebb argues, then the ordinance would cover sounds originating *within* medical clinics and public schools, and wouldn't cover amplified noise that isn't excessively loud. In support of this contention, Hebb cites *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), in which the Supreme Court recognized that "exemption[s] from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage" and thereby "diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at 51–52 (cleaned up).

But unlike the ordinance at issue in *City of Ladue*, which exempted ten content-based categories of messages from its general ban on residential yard signs, Section 10-85(2) has no exceptions that might cast doubt on the city's regulatory purposes. The limited geographic scope of Asheville's ordinance does not give rise to the same inference of improper motive. *See Hill*, 530 U.S. at 724 (rejecting the "theory that a statute restricting speech becomes unconstitutionally content based because of its application 'to the specific locations where [that] discourse occurs'" (quoting *id.* at 767 (Kennedy, J., dissenting))); *McCullen v. Coakley*, 573 U.S. 464, 470 (2014) (concluding that a statute precluding leafleting within a buffer zone around reproductive health care facilities was content-neutral). Asheville has offered a sensible and content-neutral justification for focusing the amplification ban on the public ways surrounding medical clinics and public schools: sounds originating within those areas "are already subject to decibel restrictions," J.A. 114, and an amplification ban that applied to the facilities themselves might preclude the use of

16

a P.A. system, *see* Affidavit of Ben E. Woody at 5, Hebb v. City of Asheville, No. 1:22-cv-222 (W.D.N.C. Nov. 7, 2022), ECF No. 7-1.

Hebb contends that Section 10-85(2)'s facially content-neutral prohibition falls disproportionately on "pro-life messaging," effectively "abolishing" his "disfavored[] speech." Response Br. at 28. But even assuming the burdens imposed by the ordinance do fall disproportionately on speech like Hebb's, "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen*, 573 U.S. at 480. Instead, "[a] regulation that serves purposes unrelated to the content of expression"—as Asheville's ordinance does—"is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.

Hebb also cites *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011), in which the Sixth Circuit rejected a city government's stated interests in a leafleting restriction. *See id.* at 737–38. We are not persuaded that *Saieg*'s reasoning applies here. In *Saieg*, city police required that all distribution of materials during a large public festival occur from "an information table located in the street, not on the sidewalk," citing interests in crowd control and public safety. *Id.* at 731; *see id.* at 736. But the city kept the same sidewalks open to public foot traffic during the festival, and even permitted sidewalk vendors. That showed that the city's "interests in crowd control and public safety [were] not so pressing that they justif[ied] restricting normal activity that occurs on streets and sidewalks." *Id.* at 737.

There are no comparable facts here. The record does not suggest that Asheville permits activities within the 150-foot buffer zone that "undercut the credibility of [its]

17

asserted government interests." *Id.* at 738. And it was reasonable for Asheville to adopt a different noise-regulation strategy for the public ways *surrounding* medical clinics than for the clinics themselves, which, in addition to being subject to Section 10-83's absolute decimal limits, presumably already have their patients' health interests in mind.

In short, Section 10-85(2) applies "to all demonstrators whether or not the demonstration concerns abortion, and whether they oppose or support the woman who has made an abortion decision." *Hill*, 530 U.S. at 725. And, drawing justifiable inferences in favor of Asheville, the record suggests that the ordinance was adopted to protect medical patients by targeting overly loud sounds outside of medical clinics. That is a content-neutral purpose.

2.

We next consider whether the district court erred in concluding that, viewed in the light most favorable to Asheville, Section 10-85(2) is not narrowly tailored to a significant government interest. We conclude that it did.

i.

Without question, Asheville "has a substantial interest in protecting its citizens from unwelcome noise." *Ward*, 491 U.S. at 796 (alteration omitted) (quoting *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984)).[10] And the Supreme Court has recognized that "[n]oise control is particularly important around

---

[10] "[W]e generally have not required the government to present evidence to show the existence of a significant governmental interest; common sense and the holdings of prior cases have been found sufficient[.]" *Reynolds*, 779 F.3d at 227.

18

hospitals and medical facilities during surgery and recovery periods." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 772 (1994); *see Hill*, 530 U.S. at 715 (recognizing that State's legitimate interest in protecting citizens' health and safety "may justify a special focus on . . . the avoidance of potential trauma to patients associated with confrontational protests"); *see also id.* at 729 (noting that "[p]ersons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions"). The Court also has "repeatedly recognized the interests of unwilling listeners in situations where 'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure'"—including, critically, "in going to and from . . . a medical facility." *Hill*, 530 U.S. at 717–18 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975)).

As in *Ward*, it is "undeniable" that banning amplification within 150 feet of a medical clinic serves "the city's substantial interest in limiting sound volume" near clinics "in a direct and effective way." *Id.* at 800. "Absent this requirement, the city's interest would have been served less well, as is evidenced by the complaints about excessive volume" that Asheville received under its prior noise-ordinance regime. *Id.*

As already discussed, we are unpersuaded by Hebb's contention that Section 10-85(2)'s over- and under-inclusivity proves that Asheville's stated interest is not genuine or substantial. The ordinance does not have content-based carveouts that reveal an impermissibly viewpoint-based interest, nor does the city permit activities within the buffer zone that undermine its legitimate interest in patient well-being. And Asheville was justified in targeting the particular locations in which the threats to its legitimate

19

government interest tend to arise—the areas *outside* medical clinics, not the clinic properties themselves.

ii.

"A content-neutral regulation is narrowly tailored if it does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Reynolds*, 779 F.3d at 226 (quoting *McCullen*, 573 U.S. at 486). A regulation "need not be the least restrictive or least intrusive means of serving the government's interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *McCullen*, 573 U.S. at 486 (cleaned up). "We must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary." *Madsen*, 512 U.S. at 772. The government also must show that it tried to address the problem through less speech-restrictive means. *Reynolds*, 779 F.3d at 231.

Section 10-85(2) does not burden substantially more speech than is necessary to further Asheville's legitimate regulatory interests. The ordinance limits a single medium of speech in a type of public space in which "[n]oise control is particularly important." *Madsen*, 512 U.S. at 772.

Asheville's ordinance closely resembles others that have survived overbreadth challenges. In *Madsen v. Women's Health Center, Inc.*, the Supreme Court upheld—under

20

stricter scrutiny than applies here[11]—a state-court injunction prohibiting "sound amplification equipment . . . within earshot of the patients inside" an abortion clinic during its operating hours, or within 300 feet of the residences of its staff. 512 U.S. at 760; *see id.* at 772–74. In *Medlin v. Palmer*, 874 F.2d 1085 (5th Cir. 1989), the Fifth Circuit upheld a Dallas ordinance, challenged by anti-abortion activists, that prohibited "any mechanical loudspeaker or sound amplifier" operated within 150 feet of schools, medical facilities, or nursing homes. *Id.* at 1087 n.1. And in *Pine v. City of West Palm Beach*, 762 F.3d 1262 (11th Cir. 2014), the Eleventh Circuit declined to enjoin a city ordinance, challenged by anti-abortion activists, that prohibited "any unnecessary noise or amplified sound . . . or other electronic audio device . . . within 100 feet of any portion of a building housing a health care facility." *Id.* at 1265 n.2; *see also O'Connell v. City of New Bern*, 447 F. Supp. 3d 466, 480 (E.D.N.C. 2020) (finding that an ordinance imposing "a 100-foot noise limitation for sound amplification devices" was narrowly tailored).

Of course, a flat ban will often sweep more broadly than a flexible standard, but that in itself is not constitutionally fatal. Indeed, in a narrow-tailoring analysis, the administrability and evenhandedness of a bright-line rule may outweigh its relative breadth. In *Hill v. Colorado*, for example, the Supreme Court upheld a statute that "forbids all unwelcome demonstrators to come closer than eight feet" to a person near a health-care

---

[11] *Madsen* involved a state-court injunction, not a generally applicable regulation. It held that "when evaluating a content-neutral injunction, [the] standard time, place, and manner analysis is not sufficiently rigorous," and the court "must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen*, 512 U.S. at 765.

21

facility, even though the statute "will sometimes inhibit a demonstrator whose approach in fact would have proved harmless." 530 U.S. at 729. The Court explained that "[a] bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." *Id.* Similarly, Asheville was justified in concluding that a flat ban on amplification within the buffer zone "provide[s] specific guidance to enforcement authorities" and thereby "serve[s] the interest in evenhanded application of the law." *Id.* at 715.

Hebb compares Asheville's ordinance to the amplification ban struck down by the Fifth Circuit in *Reeves v. McConn*, 631 F.2d 377 (5th Cir. 1980), but the comparison is inapt. In a First Amendment narrow-tailoring analysis, "the nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations . . . that are reasonable.'" *Madsen*, 512 U.S. at 772 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972)). The regulation found unconstitutional in *Reeves* was overbroad because it applied to "the streets and sidewalks of a downtown business district," which was "already a busy and noisy place." 631 F.2d at 384. By contrast, Asheville's ordinance applies to the areas surrounding health care facilities. "Noise control is particularly important" in such areas, *Madsen*, 512 U.S. at 772, in part because patients "are often in particularly vulnerable physical and emotional conditions," *Hill*, 530 U.S. at 729. "The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." *Madsen*, 512 U.S. at 772–73.

Additionally, the evidence, viewed in the light most favorable to Asheville, suggests that before enacting Section 10-85(2) the city "seriously undertook to address the problem

22

with less intrusive tools readily available to it." *Reynolds*, 779 F.3d at 231 (quoting *McCullen*, 573 U.S. at 494). Despite Asheville's efforts to enforce its existing noise-disturbance standard, "the City received 62 noise complaints" originating from an area south of downtown Asheville with a high concentration of medical clinics—"many pertaining to the use of amplified sound in the immediate vicinity of open and operating medical facilities"—"during the eight-year period *before* it adopted [Section 10-85(2)]." *Hebb*, 2024 WL 1261205, at \*3, \*8 (citation omitted); *see* J.A. 115 (affidavit from Woody explaining that "amplified sound around medical facilities was a particularly disruptive condition in the City, and one which persisted in spite of the subjective prohibition on 'noise disturbances'").

As for fixed decibel limits, we have long recognized the challenges of fairly enforcing such standards in public rights of way. *See U.S. Lab. Party v. Pomerleau*, 557 F.2d 410 (4th Cir. 1977) (holding that decibel limits, as applied to amplified speech on a public street, enabled arbitrary enforcement because measurements vary with distance from the source); *cf.* J.A. 114 (affidavit from Woody noting challenges of taking consistent decibel readings from potentially "transient" sources of noise "within rights of way"). Viewed in the light most favorable to the city, the record suggests that Asheville's misgivings about alternative noise-control strategies are not mere post-hoc justifications, but are grounded in experience.

In any event, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest," a speech "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served

23

by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. "The alternative regulatory methods hypothesized by" Hebb and the district court—namely, the very same ones Asheville concluded were insufficient—"reflect nothing more than a disagreement with the city over how much control of volume is appropriate or how that level of control is to be achieved." *Id.* In light of the limitations of any noise-reduction strategy, the inherent over-inclusivity of Asheville's bright-line, geographically limited amplification ban is not constitutionally fatal.

3.

The district court did not reach the final requirement of intermediate scrutiny: whether Asheville's ordinance leaves open ample alternative channels of communication. "In order to satisfy this standard, the available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." *Ross*, 746 F.3d at 559 (cleaned up). "Rather, the relevant inquiry is simply whether the challenged regulation 'provides avenues for the more general dissemination of a message.'" *Id.* (quoting *Green v. City of Raleigh*, 523 F.3d 293, 305 (4th Cir. 2007)).

Viewing the record in the light most favorable to Asheville, that requirement "is easily met." *Ward*, 491 U.S. at 802. Hebb "may still use amplified sound anywhere outside the quiet zone." *Pine*, 762 F.3d at 1275. And he is "free to talk, sing, hold up signs, and distribute literature to patients within the quiet zone." *Id.* That "patients entering the [c]linic [may choose] to ignore" messages communicated through these alternative channels "does not mean that Plaintiff['s] right to communicate effectively is infringed or that the [ordinance] is unconstitutional." *Id.* We agree with the Fifth Circuit's reasoning in *Medlin*:

24

because the ordinance does not prohibit "unamplified speech," "the distribution of written material," or "the display of signs and placards," it "falls way short of precluding alternative avenues of communication." *Medlin*, 874 F.2d at 1090; *see Hill*, 530 U.S. at 726 (upholding a statute that established a buffer zone but "place[d] no limitations on the number, size, text, or images of the placards" that protestors could carry outside the buffer zone); *see also O'Connell*, 447 F. Supp. 3d at 480 (amplification ban left ample alternative channels because plaintiffs "were free to preach using their voices without amplification").

*    *    *

Because Asheville has not moved for summary judgment, we express no opinion as to whether Section 10-85(2) survives intermediate scrutiny when the record is viewed in the light most favorable to Hebb. We hold only that the district court erred in concluding that, viewing the facts in the light most favorable to Asheville, Section 10-85(2) violates Hebb's freedom of speech. We reverse the district court's grant of summary judgment to Hebb on his First Amendment claim and remand for further proceedings consistent with this opinion.

IV.

We turn next to Hebb's due process challenge. Hebb argues that the 2021 version of Section 10-85(2)[12] was unconstitutionally vague as applied by Asheville to prevent him

---

[12] Hebb argues in his appellate briefing that the 2023 version of the ordinance, which includes a definition for the term "amplified sound," remains unconstitutionally vague. *See* Response Br. at 35–36. "Because this argument is raised for the first time on appeal, we do not address it." *United Rentals, Inc. v. Angell*, 592 F.3d 525, 531 n.2 (4th Cir. 2010).

25

from speaking through a plastic cone within the buffer zone.[13] *See* J.A. 37. The district court denied Asheville's motion to dismiss on this claim, granted Hebb summary judgment, and awarded nominal damages. We reverse.

The "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth" and Fourteenth Amendments. *United States v. Williams*, 553 U.S. 285, 304 (2008). "To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc). "When speech is involved," as it is here, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). "But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Holder v. Humanitarian L.*

---

[13] Hebb does not allege that he ever used a plastic cone outside the Health Clinic. But "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphasis omitted). Hebb has alleged "a sufficiently imminent injury" for standing purposes because his complaint demonstrates his "intention" to speak through a plastic cone outside the Health Center, which is "conduct arguably affected with a constitutional interest, but proscribed by [Asheville's ordinance], and there exists a credible threat of" enforcement. *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see* J.A. 36 (alleging that Asheville "prevents Hebb and others from using plastic cones under § 10-85(2)"). Accordingly, the vagueness question we confront here is whether "the statutory terms are clear in their application to [Hebb's] *proposed* conduct." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010) (emphasis added).

26

*Project*, 561 U.S. 1, 19 (2010) (quoting *Williams*, 553 U.S. at 304). And "[l]ess clarity is required in purely civil statutes" or ordinances like this one "because the 'consequences of imprecision are qualitatively less severe.'"[14] *Manning*, 930 F.3d at 272 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)).

At issue here is fair notice. The district court concluded that the 2021 version of Section 10-85(2) did not give Hebb fair notice of what is prohibited because "[t]he term 'amplify' is commonly defined as to make a sound louder or stronger," and "a person of ordinary intelligence would [not] necessarily understand the use of a plastic cone to make a sound 'louder or stronger.'" *Hebb*, 2024 WL 1261205, at *13. On appeal, Hebb argues that "no reasonable definition of 'amplified sound' would include plastic cones." Response Br. at 36.

We disagree. No doubt the very reason Hebb wants to use a plastic cone is that it makes his voice, from the perspective of his intended audience, louder or stronger. *See* Response Br. at 2 (explaining that a "plastic cone lets Hebb speak winsomely with his intended audience"); *id.* at 32 ("Without an amplification device or a plastic cone, Hebb is required to speak bare throat, which forces him to yell[.]"). And even before the City Council supplemented the ordinance with a commonsense definition of "amplified sound," Asheville's intention to shield patients entering medical clinics from loud sounds was quite clear.

---

[14] Despite Hebb's professed fear of "arrest," J.A. 149; *see also* Response Br. at 16 (referring to "criminal sanction"), Section 10-85(2)'s sanctions are purely civil, *see* Asheville, N.C. Code of Ordinances § 10-93.

Hebb's reliance on *Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003), is unavailing. In *Lytle*, we held that a law "prohibit[ing] loitering on certain Virginia bridges" was unconstitutionally vague as applied to plaintiffs who were "arrest[ed] for participating in a peaceful protest" on a bridge. *Id.* at 466; *see id.* at 468–69. We explained that "[n]o reasonable person would know that protesting and loitering were one and the same activity and that an anti-loitering statute would attach criminal sanctions to the classic political expression undertaken by the [plaintiffs]." *Id.* at 469. By contrast, it was reasonable to expect that Asheville might apply its (purely civil) ban on amplified sound to prevent Hebb from making his voice more audible to patients entering the Health Clinic by speaking through a plastic cone.

Nor are we persuaded by Hebb's reliance on our decision in *U.S. Labor Party v. Pomerleau*, 557 F.2d 410 (1977). *Pomerleau* involved an ordinance that set maximum sound levels for various zones, "defined as a specific number of decibels 'at any point on the property line.'" 557 F.2d at 411. Because decibel readings vary with distance from the source, a speaker could be "penalized" for failing to "correctly guess[] where the investigator [would] take a measurement." *Id.* at 412. That ordinance was vague because the inherent "subjectiv[ity]" of the decibel standard enabled "arbitrary enforcement," *id.*—not, as Hebb argues, because it "infring[ed] on speech in unexpected ways," Response Br. at 35. By contrast, Section 10-85(2) employs an objective standard with no apparent risk of arbitrary enforcement. Indeed, Asheville's ordinance appears specifically designed to *avoid* the subjectivity of decibel limits as applied to potentially "transient" sound sources within public ways. J.A. 114.

28

Admittedly, whether speaking through a plastic cone violates a ban on "amplified sound" presents a close case. But "close cases" do not "render[] a statute vague." *Williams*, 553 U.S. at 305. As the Supreme Court has explained, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306. For example, the Court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.*

By contrast, the fact that must be proved to establish a violation of Section 10-85(2) is that Hebb produced, or caused to be produced, "amplified sound" within the buffer zone. That is a "clear question[] of fact"; it involves "a true-or-false determination, not a subjective judgment." *Id.* "To be sure, it may be difficult in some cases"—including, perhaps, in the case of a plastic cone—"to determine whether these clear requirements have been met." *Id.* But the fact "[t]hat some smidgen of ambiguity remains is no reason to find [the ordinance] unconstitutionally vague." *Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022). Instead, what the district court saw as a "complex evidentiary" debate over whether a cone technically "amplifies" sound, *Hebb*, 2024 WL 1261205, at *13, is simply a dispute over the application of an objective standard to an edge case.

We therefore reverse the district court's decisions denying Asheville's first motion to dismiss as to Hebb's due process claim and granting Hebb summary judgment on that claim. We remand with instructions to dismiss the due process claim.

29

V.

We affirm the district court's denial of Asheville's two motions to dismiss as to Hebb's First Amendment claim but reverse the entry of summary judgment in Hebb's favor. And because Hebb's due process claim fails as a matter of law, we reverse the denial of Asheville's first motion to dismiss as to the due process claim and remand with instructions to dismiss that claim.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

In 2021, the City of Asheville, North Carolina revised its noise ordinance to ban "amplified sound" within 150 feet of schools or medical facilities. Zachary Hebb claimed Asheville revised the ordinance to stop him from expressing his opposition to abortion by protesting on the public sidewalk near the area's only abortion clinic. He alleged the ordinance violated his First Amendment rights by targeting his specific viewpoint and violated his Fourteenth Amendment rights because he could not reasonably determine whether the phrase "amplified sound" included his intended use of a plastic cone. And the district court agreed, issuing a preliminary injunction. The city then revised the ordinance again, this time defining "amplified sound." Hebb conceded that the definition eliminated the ordinance's vagueness but insisted that its prior flaws chilled him from speaking as he wanted to do. And he argued that even the most recent version of the noise ordinance violated his First Amendment free speech rights. The district court agreed. So, it issued a permanent injunction against the enforcement of the revised noise ordinance and awarded him nominal damages for the chilling effects of the earlier version. Today, the majority vacates that decision. I disagree.

If the First Amendment's right to free speech protects anything, it protects speech in the public square about controversial political and social issues like abortion. That, of course, doesn't stop a municipality from adopting content-neutral regulations that are narrowly tailored to a significant state interest, even if it has an incidental effect on protected speech. Asheville says that is what's going on here. It claims that neither of its revisions to the noise ordinance targeted Hebb at all. Instead, it insists both were designed

31

to protect patients at medical facilities from noise that impairs their treatment and recovery and students from noise that disrupts their learning. But the ordinance Asheville ultimately adopted wasn't narrowly tailored—it banned lots of noise that did not interfere with medical facilities or schools, and it permitted noise coming from inside clinics and schools that it banned if it were coming from outside those places. On top of that, Asheville offered no evidence it considered any less-restrictive limitations than the 150-foot amplified sound ban. So, I would affirm the district court's holding that the ordinance violated Hebb's First Amendment rights.

As to his Fourteenth Amendment due process claim, I agree with the district court that the phrase "amplified sound," before the city defined it in the most recent version of the ordinance, was unconstitutionally vague. The ordinary meaning of amplify and amplification supports the district court's decision. So do the varying ways Asheville addressed the meaning of amplified sound in its noise ordinance through the years. As a result, I would affirm that part of the district court's order as well.

## I.

Zachary Hebb is a "Christian who believes abortion is the wrongful killing of innocent human life." J.A. 9. He feels compelled to share his views and convictions about abortion with others near a clinic in Asheville. The clinic is affiliated with Planned Parenthood and is the only abortion provider in western North Carolina. He feels using an amplifier is the most effective means of communicating his message. Hebb began speaking against abortion near the clinic in March 2019.

32

Shortly before that time, the City of Asheville began considering an amendment to its noise ordinance. The city's work culminated in the November 2020 release of a proposed noise ordinance to the public. That proposed ordinance addressed issues like loud music from downtown bars, construction noise, sound from commercial equipment and other issues related to Asheville's growth. It said nothing about amplified noise outside schools, abortion clinics or medical clinics in general.

During the first half of 2021, representatives of Planned Parenthood communicated with city officials about protests outside the clinic. They complained about a protestor who they said screamed from a ladder with a megaphone. Planned Parenthood then began to engage with Asheville's City Council and staffers about developing a strategy to respond to protests outside the clinic. Eventually, they sent language to Asheville's Director of Development Services Ben Woody to add to the city's noise ordinance. He oversaw the inclusion of the language in the draft ordinance. Representatives of Planned Parenthood urged Woody to work towards the swift passage of a new ordinance with its proposed language.

On June 22, 2021, Woody presented a revised proposed noise ordinance to the city council. The proposed revision included an addition to Ordinance Code § 10.85 with a prohibition on "producing amplified sound within 150 feet of a public school or healthcare facility." J.A. 299.

A few days later, Woody emailed Hebb about complaints the city had received concerning amplified sound around the abortion clinic. In the email, Woody asked Hebb to "either cease the use of the amplified megaphone, or lower the volume in a manner that

33

does not create a noise disturbance." J.A. 312. On June 26, 2021, Woody did something he didn't normally do—he personally delivered Hebb a citation for violating the city's noise ordinance due to "volume; enhanced by mechanical means." J.A. 313. Woody issued Hebb another citation on July 24, 2021, again by personal delivery. This time, the citation also referenced § 10-84 of the existing noise ordinance.

On July 27, 2021, the city council amended its ordinance to add § 10-85(2), which stated that "[u]nless otherwise allowed by this chapter, no person shall engage in any of the following enumerated activities . . . (2) Producing, or causing to be produced amplified sound within 150 feet of the property line of a public school where classes or other educational activities are occurring, or a medical clinic that is open or otherwise caring for patients." J.A. 325. This 2021 ordinance did not define "amplified sound." J.A. 325.

Hebb sued the city, claiming § 10-85(2)'s ban of amplified sound violated his free speech rights under the First Amendment.[1] He also alleged that the provision's vagueness chilled his free speech rights and enabled the city to enforce speech restrictions in an ad hoc, arbitrary and discriminatory manner, in violation of the Fourteenth Amendment's due process clause. And Hebb moved for a preliminary injunction.

The city moved to dismiss Hebb's complaint under Federal Rule of Civil Procedure 12(b)(6). In February 2023, the district court denied the motion to dismiss and granted

---

[1] The suit also named Woody, individually and in his official capacity. But after the city and Woody moved to dismiss, Hebb and Woody agreed to dismiss Woody in his individual capacity. Although Woody remains a party in his official capacity, for convenience, I will refer to the city and Woody collectively as "the city."

Hebb's motion for a preliminary injunction, enjoining the city from enforcing § 10-85(2). In denying the motion to dismiss, the court reasoned Hebb's allegations, if accepted as true, plausibly stated a claim that the city enacted § 10-85(2) to limit speech about abortion rather than for content-neutral reasons. In granting Hebb's motion for a preliminary injunction, the court also concluded that he had shown a likelihood of success on his claim that § 10-85(2) was unconstitutionally vague because it was unclear if the ban applied to the use of plastic cones in addition to electronic amplification devices.

Following the court's injunction order, the city modified the noise ordinance again. In August 2023, it amended § 10-82, the definition section of the ordinance, to define "medical clinic" to include locations where statutorily described "health care providers" provide inpatient or outpatient services. J.A. 346. It also defined "amplified sound" to mean "a sound augmented by any electronic or other means that increases the sound level or volume." J.A. 346. And the city replaced the previous § 10-85(2) in its entirety with the following language which prohibits:

> Producing, or causing to be produced amplified sound within 150 feet of the property line of a public school where classes or other educational activities are occurring, or a medical clinic that is open or otherwise caring for patients. For purposes of clarity, it is expressly noted that this prohibition does not apply to sounds originating from public schools or medical clinics themselves, as such sounds are already subjected to decibel limitations under Section 10-83 of the City Code.

J.A. 346.

After the amendment, the city moved to dissolve the preliminary injunction as moot, claiming the 2023 amended ordinance was no longer vague and was now an unambiguous content-neutral time, place and manner restriction. For those same reasons, it also sought

35

to dismiss Hebb's complaint under Rule 12(b)(1). In an affidavit filed with the motion, Woody said that the city added the definition of amplified sound to "clarify that Section 10-85(2) was always intended to apply to all forms of amplification, not just electrical amplification." J.A. 114. For his part, Hebb moved for summary judgment on both of his claims, continuing to seek nominal damages and permanent injunctive relief.

The court denied the city's motions to dismiss the complaint and to dissolve the injunction. Even though Hebb conceded that the 2023 amplification ban is no longer unconstitutionally vague, the court denied the city's motion to dismiss for mootness. In reaching this decision, the court recognized that Hebb could be entitled to damages if he proved the 2021 amplification ban was unconstitutionally vague and that it chilled his speech. The court also allowed Hebb to proceed with his free speech challenge to the 2023 ban because despite the city's changes, Hebb was still prohibited from using amplified sound just as he claims he was under the 2021 ban.

At the same time, the court granted Hebb's motion for summary judgment. As to his free speech challenge to the 2023 amplification ban, it concluded the city had a significant interest in controlling noise around medical facilities. But the court held that § 10-85(2), as modified, was overbroad and underinclusive. The court also found that the city produced no evidence from which a reasonable trier of fact could conclude it considered less-speech-restrictive alternatives before adopting the 2023 ban. So, it granted Hebb's motion for summary judgment as to his free speech claim, concluding that the city provided no evidence that created a genuine dispute of material fact that the amplification

36

provision in the 2023 ordinance was narrowly tailored and enjoining enforcement of the modified ban.

The district court also granted Hebb summary judgment on his claim that the 2021 ban was unconstitutionally vague because it did not define "amplified sound."[2] J.A. 386. And the court awarded Hebb nominal damages finding there was no dispute that he did not use a plastic cone to speak out for fear of punishment based on the perceived vagueness of the 2021 ordinance.

This appeal followed.[3]

## II.

On appeal, the city argues that the district court erred in finding the challenged ordinance violated Hebb's First Amendment rights as a matter of law. The city contends that § 10-85(2) furthered an established and substantial government interest in protecting

---

[2] The court did not decide whether the 2023 ban was unconstitutionally vague because Hebb conceded that it did not violate his rights under the due process clause.

[3] The city timely appealed the district court's order granting Hebb summary judgment and denying its motions to dismiss, and we have jurisdiction to review the final order and rulings leading up to that judgment under 28 U.S.C. § 1291. We review orders granting summary judgment and motions to dismiss de novo. *See Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021). Summary judgment is appropriate if, viewing the facts and justifiable inferences from them in the light most favorable to the non-movant, there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 173 (4th Cir. 2024). The district court also considered the city's motion to dismiss for failure to state a claim under Rule 12(b)(6) and a motion to dismiss for mootness under Rule 12(b)(1) based on potential lack of subject matter jurisdiction. I take no issue with the majority's decision to affirm the denial of the city's two motions to dismiss. Thus, I concur in part to affirm these decisions. My dissenting views focus on the majority's reversal of the grant of summary judgment to Hebb.

37

medical patients from harmful noise prior to and following medical procedures, is narrowly tailored and leaves open other avenues for speech. The city also maintains that the 2021 amplification ordinance was not unconstitutionally vague. While the majority agrees, I do not.

**A.**

Beginning with Hebb's free speech claim as to the 2023 ordinance, the first inquiry is whether the speech in question is protected by the First Amendment. *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003). If so, the court must next identify the nature of the forum because "the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). After the court determines the type of forum, it must evaluate whether the justifications for the exclusion satisfy the applicable standard. *Id.*

Here, the city does not deny that Hebb is attempting to engage in protected speech in a traditional public forum. For good reason. Hebb's protests about abortion are certainly protected speech. *Hill v. Colorado*, 530 U.S. 703, 715 (2000). And public walkways and sidewalks are areas "which by long tradition or by government fiat have been devoted to assembly and debate, [thus] the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

The question then is whether the city's regulation of Hebb's speech in that public forum violated the First Amendment. "The government can restrict speech in a traditional public forum on the time, place and manner of expression only [] if the restriction is content-neutral, is narrowly drawn to serve a significant state interest, and leaves open

38

ample channels of communication of the information." *Am. C.L. Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005). The city bears the burden of proving its noise ordinance satisfies this standard. *See Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020). Thus, breaking this test into bite-sized pieces, the city must show that its noise ordinance is (1) content-neutral, (2) serves a significant state interest, (3) is narrowly tailored to that interest and (4) leaves open ample channels of communication. But to survive summary judgment, the city's task is lighter. It must only raise a genuine dispute of material fact or demonstrate Hebb's lack of entitlement to judgment as a matter of law. However, even construing the evidence presented in the city's favor, it has not done so.

**1.**

Hebb does not dispute that the noise ordinance is facially content-neutral. And I agree that the ordinance does not "facially distinguish between . . . messages based on content." *See Am. Legion Post 7 of Durham v. City of Durham*, 239 F.3d 601, 609 (4th Cir. 2001).

**2.**

As to the city's interest, "we do not typically require governmental entities to present evidence demonstrating the existence of a significant interest." *Billups*, 961 F.3d at 685. "[C]ommon sense and the holdings of prior cases" can be sufficient. *Reynolds v. Middleton*, 779 F.3d 222, 227 (4th Cir. 2015). And the Supreme Court has deemed protecting medical patients from harmful noise to be a significant interest. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 767–68 (1994); *see also Hill*, 530 U.S. at 729. I certainly take no issue with this proposition. Nor is that any less the case for patients

39

receiving medical treatment, counseling and other services associated with pregnancy. *Madsen* makes that clear. *See Madsen*, 512 U.S. at 768; *see also Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376 (1997).[4]

### 3.

Next, the city must show that it narrowly tailored § 10-85(2) to its interests without unnecessarily burdening speech. Two factors in this analysis are whether the ordinance is overbroad and/or underinclusive. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015); *see also McCullen v. Coakley*, 573 U.S. 464, 493 (2014). An ordinance is overbroad if it bans speech that does not further the stated government interest. It is underinclusive if it bans some, but not all, speech that would impede the stated interests.

---

[4] That said, the record's support of the city's stated interest is questionable. To be sure, Woody's affidavit in support of the defendants' motion to dissolve the preliminary injunction claims that it adopted § 10-85(2) to address the "particular problem of amplified sound being used in rights of way near medical providers." J.A. 115. And though the city provides no corroborating documentation, another Woody affidavit presented to the district court in opposition to Hebb's motion for a preliminary injunction indicates the city received 62 complaints in the general vicinity of medical facilities. Affidavit of Ben E. Woody at 1–2, *Hebb v. City of Asheville*, No. 1:22-cv-222 (W.D.N.C. Nov. 7, 2022), ECF No. 7-1. But before the city passed its 2021 amendment to the ordinance, it released an initial version of the revised noise ordinance to the public and discussed the noise ordinance updates in committee. That version of the ordinance did not address noise in the areas of medical facilities or schools in its list of prohibitions. J.A. 265. The first time the city proposed changes to its ordinance to address noise around medical facilities was after Planned Parenthood's complaints about protests around the abortion clinic. In fact, Planned Parenthood sent Woody the language that the city ultimately added to the version of the noise ordinance now in dispute and urged him to work to get the revised ordinance passed. This evidence supports Hebb's claim that the city's true motivation was to stifle his views on abortion. Of course, the city offered competing evidence. So, while I disagree with the majority's statement that the record contains no evidence of the city's motivation, I agree the factual dispute defeats summary judgment on this ground. This dispute, however, doesn't preclude summary judgment because the sound amplification ban in Asheville's noise ordinance is unconstitutional for other reasons.

40

*Id*. Either can indicate the ordinance is not narrowly tailored. *Id*. Here, even construing the evidence in the light most favorable to the city, § 10-85(2) is both overbroad and underinclusive.

First, overbreadth. Section 10-85(2) prohibits "amplified sound within 150 feet of the property line of . . . a medical clinic that is open . . . ." J.A. 346. And now, "amplified sound" means "a sound augmented by any electronic or other means that increases the sound level or volume." J.A. 346. But there is no volume level that triggers the ban. As a result, something as mundane as using a speakerphone feature to talk on a mobile phone within 150 feet of an open clinic would violate the ordinance. So would driving down the road in front of the clinic with the radio turned up. Or for that matter, using a TV in the next-door office building would violate the ordinance. In fact, as defined by the city, noise could be amplified, and thus banned, even if inaudible to the clinic. Banning these types of amplified noise does not further the city's stated interest in protecting patients. Thus, § 10-85(2) is overbroad.

Second, underinclusivity. The amended § 10-85(2) "does not apply to sounds originating from . . . medical clinics themselves, as such sounds are already subjected to decibel limitations under Section 10-83 of the City Code." J.A. 346. In other words, the prohibition does not include amplified noise coming from within the clinic and the buffer zone. That means those inside the clinic and the buffer zone area can amplify sound up to the limits of § 10-83 without violating § 10-85(2). If amplified noise is really the concern, why can a medical clinic use amplification when Hebb or another citizen cannot?

41

The ordinance likewise does not apply to loud noise that is not amplified. For example, subject to the ordinance's general regulation on sound level limits, screaming or banging on a drum without any amplifying device could be as loud or even louder than amplified noise. Yet the ordinance wouldn't ban it. If the ordinance is designed to ban the noise that disrupts patients' treatment and recovery, why only amplified sound? Section 10-85(2) is underinclusive.

### 4.

Relatedly, the district court found that there was no evidence from which a reasonable trier of fact could conclude that the city considered less-speech-restrictive alternatives before adopting the total-off-property amplification ban. I agree.

To be sure, Woody's affidavit submitted with the defendants' motion to dissolve the preliminary injunction and dismiss Hebb's complaint as moot mentions the city's pre-existing noise disturbance and decibel standards. It also tries to explain why those standards were inadequate. And the majority points to a separate Woody affidavit—this one filed in opposition to Hebb's preliminary injunction motion—which referenced 62 noise complaints in the area where several medical facilities are located. To the majority, these complaints constitute evidence that the city tried less-intrusive alternatives. Maj. Op. at 23–24. But Woody's affidavits are the sort of "post-hoc," self-serving and conclusory justification we rejected in *Billups*. 961 F.3d at 689 (rejecting the city's "myriad post-hoc justifications"). *Billups* makes clear that to prove a content-neutral restriction on prohibited speech is narrowly tailored, the government "must, inter alia, present evidence showing that — *before* enacting the speech-restricting law — it 'seriously undertook to address the

problem with less intrusive tools readily available to it.'" *Billups*, 961 F.3d at 688 (quoting *McCullen*, 573 U.S. at 494) (emphasis added). The key word here is "before." Woody's post-ordinance affidavits are not the type of evidence *Billups* commands—a point the majority never addresses.

And even if we considered the affidavits, they—at most—show that the prior version was inadequate. Our precedent requires more. It requires proof that the city actually considered less-intrusive alternatives to the ordinance it enacted. Woody's affidavits don't do that.

Likewise, the 2020 proposed noise ordinance doesn't satisfy this requirement. While it did pre-date the amplified sound ban, it doesn't provide any evidence the city considered less-restrictive alternatives. In fact, it did not even address medical facilities. Instead, it focused on bars and construction noise. So, it cannot be construed as satisfying *Billups* either.

Lacking evidence, the city argues in its brief that Hebb had other speech avenues—holding up signs, distributing pamphlets and speaking without amplified sound. But that argument fails to respond to *Billups*. There, we explained that "the government is obliged to demonstrate that it *actually tried* or *considered* less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Id.* (emphasis added). The existence of other speech alternatives might suggest that more-restrictive-speech regulations could have been tried. But those alternatives do nothing to show that less-restrictive alternatives were actually tried or considered. Perhaps the content of Hebb's speech—not its volume—was the issue all along.

43

In sum, there is no evidence in the record that the city considered less-intrusive limitations. So, I would affirm the district court's order granting Hebb summary judgment on his free speech claim.[5]

**5.**

The city and the majority argue that the district court's order conflicts with the Supreme Court's *Madsen* decision, the Fifth Circuit's *Medlin v. Palmer*, 874 F.2d 1085 (5th Cir. 1989) decision and the Eleventh Circuit's *Pine v. City of West Palm Beach*, 762 F.3d 1262 (11th Cir. 2014) decision. I disagree.

*Madsen* upheld a noise restriction banning amplified and other sound around an abortion clinic. 512 U.S. at 772. In doing so, it held that noise control around medical facilities was an important state interest. *Id*. No one disputes that point. Next, although it provides no analysis on this point and cites no evidence as to its conclusion, *Madsen* also held that the noise restriction banned no more speech than necessary. *Id*. If our precedent says we just compare challenged ordinances to those upheld in other cases, perhaps *Madsen* would control our decision. But that is not what our precedent says. It requires Asheville to show that it—prior to the enactment of the ordinance in question—considered less-intrusive alternatives. The city failed to do this.

As for *Medlin*, there the Fifth Circuit held that 150-foot restrictions concerning the use of a hand-held amplifier near a medical clinic did not violate the First Amendment. 874

---

[5] The fourth requirement the government must satisfy is showing that it left open ample channels of communication of the information. Since the government flunks the third part of the test, I need not, and do not, address this requirement.

F.2d at 1090. That case involves the same geographic buffer zone as § 10-85(2). So, it certainly warrants our review. But with respect for our colleagues on the Fifth Circuit, *Medlin*'s analysis on the narrowly tailored requirement is thin. And it does not convince me that we should ignore (1) § 10-85(2)'s overbreadth and underinclusivity or (2) the city's failure to consider less-intrusive means.

The same with *Pine*. True, it upheld a ban on amplified sound within 100 feet of medical facilities. 762 F.3d at 1273. But the court noted that "grave constitutional questions would arise were we to interpret the Sound Ordinance to prohibit all devices that in any way electronically produce or increase the volume of sound." *Id*. at 1270. So, even though that is exactly what the text of the ordinance at issue there did, the Eleventh Circuit construed the ordinance to target only loud, raucous and unreasonable disturbing noise. *Id*. at 1271. In other words, the court judicially modified the ordinance. With respect, I find that reasoning unpersuasive.

To avoid summary judgment, the city must produce evidence that creates a genuine dispute of material fact on these points. It has not done so. We cannot ignore the city's failure to meet its burden by merely looking at the outcomes from other cases.

**B.**

I would also affirm the district court's grant of summary judgment on Hebb's due process claim. The 2021 amplification ban was unconstitutionally vague and chilled Hebb's speech, entitling him to nominal damages.

Under the due process clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend.

45

XIV. Unconstitutionally vague governmental enactments violate the due process clause. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "We insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* To survive a vagueness challenge, "a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning*, 930 F.3d at 272.

The 2021 amplification ordinance prohibited the use of "amplified sound" within 150 feet of a medical clinic. But it did not define amplified sound. Hebb contends that he did not know if the phrase, without further clarification, included plastic cones—his preferred method of speech. He maintains he didn't use cones after the city passed the 2021 amplification ordinance out of fear of citation or arrest, even though he wanted to do so, such that he was "stymied from using a plastic cone at all for well over a year and a half before the Court granted the motion for preliminary injunction" in early 2023. J.A. 149.

The city, for its part, insists that it did not have to define the term with exactness. To the city, amplified sound always did and always would include Hebb's proposed plastic cone. For support, the city points to Woody's affidavit that says the city "added a definition for 'amplified sound' to clarify that Section 10-85(2) was *always* intended to apply to *all* forms of amplification, not just electrical amplification." J.A. 114 (emphasis added). But

46

what the city may or may not have intended is beside the point. The point is what is in the text of the ordinance. And what it says is not at all clear.

Besides, history tells a different story than Woody. The 2021 amplification ordinance was not the city's first version of the noise ordinance. Prior to 2021, the city's noise ordinance last underwent comprehensive changes in 2000. City of Asheville, *City of Asheville releases draft Noise Ordinance revisions, launches survey* (Nov. 18, 2020), https://www.ashevillenc.gov/news/city-of-asheville-releases-draft-noise-ordinance-revisions-launches-survey/ [https://perma.cc/9UZV-5L62] (last visited June 20, 2025). That version defined "amplified sound" as "any sound or noise, including the human voice, that is increased in volume or intensity *by means of electrical power*." Asheville, N.C. Code of Ordinances § 10-82(e) (June 27, 2000) (emphasis added).[6]

The district court did not consider this earlier definition, perhaps because the parties did not present it. But it seems to mean the city started with an ordinance that said amplified sound only included electronic enhancement. Then, the 2021 version dropped any definition of amplified sound. Finally, the 2023 version added a definition back into the ordinance, this time covering "electronic or other means" of producing sound, broadening the earlier definition. So, it is hard to square Woody's affidavit with the history of the city's noise ordinances.

Even without the benefit of the earlier version of the noise ordinance, the district court held a person of ordinary intelligence would not have understood that using a plastic

---

[6] A copy of the ordinance is attached as an appendix.

cone violated the ordinance by amplifying sound. I agree. Merriam-Webster defines amplify as "to make larger or greater (as in amount, importance, or intensity)" and to "increase the strength or amount of *especially*: to make louder." Amplify, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/amplify [https://perma.cc/7JDH-N8F4] (last visited June 20, 2025). As the district court noted, a plastic cone may redirect sound. But it has no power source. It doesn't add energy to the sound waves. It simply directs the sound waves in one direction.

A recent experience with my four-year-old granddaughter illustrates this point. Over the Fourth of July weekend, she wanted her grandmother and me to hurry up and get down to the lake. So, from the backyard, my granddaughter cupped her hands around her mouth and yelled, "Come on! Let's go to the dock!" Placing her two little hands around her mouth did not amplify her sound. It just attempted to direct her call, at least as much as a four-year-old can, towards us. If the city is right that Hebb's cone amplified sound, my granddaughter did so as well. That means had she cupped her hands around her mouth to call her grandparents within 150 feet of the clinic, she would have violated the noise ordinance. That can't be right.

Also, the same dictionary defines "amplifier" as "an electronic device (as in a stereo system) for amplifying voltage, current, or power." Amplifier, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/amplifier [https://perma.cc/FCE8-M3Q2] (last visited June 20, 2025). One might say that definition should not be considered because it refers only to the instrument. Perhaps. But if using a cone amplifies sound, you'd expect it to be an amplifier. Yet, it wouldn't be one under Merriam Webster's definition because

48

it's not an electronic device. How then is an ordinary person supposed to know which definition controls?

I don't think that Hebb's proposed use of a cone would even violate the 2021 version of the ordinance—which contained no definition of "amplified sound." But if it would, the ordinance was unconstitutionally vague. And the city offered no evidence to dispute Hebb's claim that he held back from speaking in the manner he wanted—using a cone—because he did not know whether the cone fell within the ordinance. So, I would affirm the district's order granting summary judgment to Hebb and awarding him nominal damages. *Williams v. Griffin*, 952 F.2d 820, 825 n.2 (4th Cir. 1991) ("Moreover, in the absence of a showing of actual injury, [plaintiff] still would be entitled to nominal damages upon proof of a constitutional violation.").

And the full history of the noise ordinance only strengthens the district court's conclusion. If the 2021 version wasn't vague, why did the city need to amend it to add a definition? And if the meaning of amplified sound is so obvious, why did the city define it differently before the 2021 amplification ordinance than it did in the 2023 ordinance?

## III.

Because I would affirm the district court's holding that the ordinance violated Hebb's First Amendment free speech rights and his Fourteenth Amendment due process rights, I respectfully dissent in part.

**APPENDIX**

ORDINANCE NO. 2726

ORDINANCE REGULATING NOISE IN THE CITY OF ASHEVILLE

WHEREAS, the City has the authority pursuant to G.S. 160A-174 to adopt ordinances and regulations that promote and protect the health, welfare and safety of its citizens, and has the authority pursuant to G.S. 160A-184 to regulate, restrict or prohibit the production or emission of noises or amplified speech, music or other sounds that tend to annoy or disturb its citizens; and

WHEREAS, excessive noise degrades the environment to a degree that may be: harmful to the health, welfare and safety of its inhabitants; interferes with the comfortable enjoyment of life and property; interferes with the well-bring, tranquillity, and privacy of the home; and causes and/or aggravates health problems.

NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF ASHEVILLE THAT:

Section 1.     Article IV of Chapter 10 of the Asheville City Code is amended to read as follows:

"ARTICLE IV. NOISE REGULATION.

Sec. 10-81. Scope.

This article shall apply to all sound, sound vibration, and noise originating within the corporate limits of the City of Asheville. Nothing in this article shall be construed to limit or prevent the City of Asheville or any person from pursuing any other legal remedies for damages or the abatement of noises in the city.

Sec. 10-82. Definitions.

The words and phrases defined in this section shall have the meaning indicated when used in this article unless otherwise specifically provided, or unless otherwise clearly required by the context:

(a)     Motorized vehicles:

Generally – Any vehicle as defined in G.S. 20-4.01(49) including, but not limited to:

(1)     Excursion passenger vehicles as defined in G.S. 20-4.01(27)a.

(2)     Common carriers of passengers as defined in G.S. 20-4.01(27)c.

(3)     Motorcycles and mopeds as defined in G.S. 20-4.01(27)d. and d.1.

Noise Ordinance 6-27-00                 1

(4)     Truck tractors as defined in G.S. G.S. 20-4.01(48).

(5)     Farm tractors as defined in G.S. G.S. 20-4.01(11).

(b)     Sound:  Any disturbance of the air or other medium that is detectable by the unaided human ear or which produces vibrations detectable by reasonable persons of normal sensitivity.

(c)     Noise:  Any sound or combination of sounds which, because of its volume or quality, tends to disturb reasonable persons of normal sensitivity or to interfere with normal human activity.

(d)     Noise disturbance:  Any unreasonably loud and raucous sound or noise which:

(1)     Endangers or injures the health or safety of humans or animals;

(2)     Endangers or injures personal or real property; or

(3)     Disturbs a reasonable person of normal sensitivity.

(e)     Amplified sound:  Any sound or noise, including the human voice, that is increased in volume or intensity by means of electrical power.

(f)     Construction:  Erection, repair, assembly, alteration, landscaping, or demolition of any building or building site.

(g)     Person:  Any individual, association, firm, partnership, corporation, or business entity.

Sec. 10-83.  General regulation.

Except as allowed in this article, no person shall willfully engage in any activity on any premises or public area in the City, which activity produces or constitutes a noise disturbance on occupied neighboring premises or public area.

Sec. 10-84.  Noise producing activities; frequent sources of complaint; noise sensitive areas.

In addition to the general prohibition set forth above, the following activities are recognized as tending to produce unreasonably loud and raucous noises and as tending to constitute noise disturbances when conducted or permitted in an unreasonable manner.  No person shall engage in any of the enumerated activities so as to cause a noise disturbance on neighboring premises.

(a)     Operation of radios, televisions, or other personal sound reproduction devices in such a manner as to be plainly audible by persons other than those for whose use the device is being operated, including the operation

Noise Ordinance 6-27-00                    2

51

of automobile sound systems in such a manner as to be plainly audible by pedestrians or the occupants of other vehicles.

(b)    Playing of any amplified or nonamplified musical instrument;

(c)    Keeping of any animal or bird that frequently or for long periods of time makes noises that tend to annoy or disturb others;

(d)    Operation of domestic power tools or mechanical devices;

(e)    Repair or testing of any motor vehicle, however fueled or powered;

(f)    Operation of any motor vehicle with an improper muffler system in violation of G.S. 20-128(a) and (b);

(g)    Operation of any motor vehicle so as to cause the tires to squeal or screech unnecessarily;

(h)    Operation of model cars, boats, or airplanes, go carts, mini bikes, or all-terrain vehicles or other unlicensed toy or recreational vehicles or devices powered by an internal combustion engine;

(i)    Street vending or peddling; or

(j)    Sounding of any automobile horn except as a warning or danger signal, or as required by law.

(k)    The erection (including excavating), demolition, alteration or repair of any building or other structure within 500 feet of a residential district as established pursuant to the city zoning ordinance, other than between the hours of 7:00 a.m. and 7:00 p.m. Monday through Saturday, except by permit from the building inspector when, in his opinion, such work will not adversely affect other persons. Following the issuance of such a permit, if the building inspector shall determine that the building operations are adversely affecting others, he shall be authorized to modify or revoke the permit. The building inspector may permit emergency work in the preservation of public health or safety at any time. This subsection shall not apply to activities associated with street and highway construction.

(l)    The use of any gong or siren upon any vehicle other than police, fire, ambulance or other official emergency vehicle.

(m)    The blowing of any steam whistle attached to any stationary boiler, except as a warning of danger.

(n)    The operation of machinery in connection with loading or unloading any vehicles or the opening and destruction of bales, boxes, crates, and containers.

Noise Ordinance 6-27-00          3

(o)　The use of any drum, loudspeaker or other instrument or device for the purpose of attracting attention by creation of noise to any performance, show, or sale or display of merchandise.

(p)　The firing or discharge of firearms in the streets or elsewhere, except by permit from the police department, or otherwise as permitted by law.

It is further recognized that certain uses, including churches, synagogues and other places of worship, medical and convalescent facilities, schools and courthouses are particularly sensitive to sound and noise. Noise-producing activities, including those specified above, may become noise disturbances when conducted in the immediate vicinity of those uses during their hours of operation.

Sec. 10-85. Exceptions.

The following are excepted from the application of this article:

(a)　Construction activity performed by an agency of government provided that all equipment is operated in accordance with manufacturer's specifications and is equipped with all noise-reducing equipment in proper condition;

(b)　Sound or noise of safety signals, warning devices, emergency pressure relief valves, church bells, and the bells or chimes of the Asheville City Building and Municipal Building between the hours of 7:00 a.m. and midnight.

(c)　Sound or noise emanating from street fairs, festivals, or celebrations conducted by or with the City of Asheville;

(d)　Sound or noise emanating from film and video production activities for which permits have been issued by the City; provided all equipment such as generators are properly muffled;

(e)　Sound or noise emanating from properly equipped aircraft operated in accordance with applicable federal rules and regulations;

(f)　Sound or noise from lawful fireworks;

(g)　Lawnmowers and agricultural equipment operated between the hours of 8:00 a.m. and 9:00 p.m. when operated in accordance with manufacturer's specifications and with all standard noise reducing equipment in place and in proper condition;

(h)　Musical accompaniment to parades or military ceremonies;

Noise Ordinance 6-27-00　　　　　　　　　　　　4

(i)     Sound emanating from regularly scheduled athletic events at city or county parks, athletic facilities, public or private schools and McCormick Field;

(j)     Governmental emergency vehicles in the course of performing their official duties;

(k)     Railroad operations, to the extent said operations are in furtherance of interstate commerce; and

(l)     Unamplified noncommercial speeches made from a fixed location in non-residentially zoned areas; and

(m)     Sound or noise emanating from construction or repair work and regulated activities of utilities regulated by the North Carolina Utilities Commission.

(n)     Refuse collection vehicles operating during daylight hours.

(o)     Sound or noise emanating from aircraft flight activity at the Asheville Regional Airport, provided said activities are conducted in accordance with FAA regulations.

Sec. 10-86. Noise Ordinance Appeals Board; powers and duties

(a)     Composition of Board; terms: There is hereby established a Noise Ordinance Appeals Board (herein "Board") to consist of 5 members and 2 alternates as follows:

**Members:**

1 City Zoning or Building Safety enforcement officer
1 City Police Officer
1 City Animal Control Officer (or employee of contracted animal control agency)
2 City of Asheville residents

**Alternates:**

1 City Employee
1 City of Asheville resident

The City employees will be designated by and serve at the pleasure of the City Manager; the residents will be appointed by the Asheville City Council for two year terms, and will serve at the pleasure of the City Council.

(b)     Purpose: The Board will advise the City on matters related to noise and noise control, and will hear and decide appeals and complaints from citizens as set forth below.

Noise Ordinance 6-27-00          5

(c)    Appeals: Persons receiving civil citations may appeal the citations to the Board in writing within 15 days of issuance. After due consideration of said appeal, the Board may direct that said civil citation be withdrawn or that the penalty be reduced by the issuing agency.

(d)    Complaints: Upon the written and verified complaint of two or more individuals from at least two separate households that a person or persons are violating provisions of this article, and after said person or persons have had notice and opportunity to be heard on the complaint, the Board may find that a violation of this article has occurred, and such finding shall be a sufficient basis for issuance of a civil citation as provided in Sec. 10-86.

(e)    Procedure; appeal:

(1)    Filing; hearing. Appeals or complaints pursuant to paragraphs (c) and (d) above may be delivered to the City Manager or an office or official designated by the City Manger. Hearing of a complaint shall occur within 15 days of receipt thereof. Board decisions shall be issued and served within 10 days of the hearing. The times for conducting hearings and issuing decisions may be extended by order of the Board.

(2)    Appeal. Appeals from decisions of the Board may be made to the City Manager, but must be in writing and delivered to the City Manager within 10 days of issuance. The Manager may consider such appeal with or without a hearing, and shall issue and serve a decision on such appeal within 10 days of its receipt; which time may be extended by the City Manager.

(3)    Manner of Service; computation of time. Whenever delivery or service of a notice, order or decision is required by this Section, such delivery or service shall be as provided in Rule 5 (b) of the North Carolina Rules of Civil Procedure for pleadings subsequent to original complaint. The times prescribed in this section for taking any action in response to a notice, order or decision delivered or served as provided herein shall be computed in accordance with Rule 6 (a) of North Carolina Rules of Civil Procedure.

(4)    Finality of Decisions. Board decisions that are not appealed to the City Manager are final upon expiration of the time for taking an appeal. Decisions of the City Manager are final upon issuance.

Noise Ordinance 6-27-00        6

(f)     <u>Rules.</u> Prior to consideration of any appeal or complaint under this Section, the Board shall adopt rules of procedure consistent with this section, which rules shall be subject to the approval of the City Attorney.

Sec. 10-87. Non-exclusivity.

Nothing in this article shall be construed to prevent or limit any person from seeking any remedy available in law or equity for activities that are or may be subject to regulation by this Chapter, or from pursuing said remedy simultaneously with proceedings under this Chapter, nor shall any of the procedures specified herein be a condition precedent to the initiation of any legal action.

Sec. 10-88. Violations; Owner and occupant responsibility.

Violations of this Article shall subject the offender to penalties as set forth in Sec. 10-89, subject to the limitations set forth below.

(a)     Penalties for violations of this article may be assessed against persons responsible for the premises or device producing or causing the noise disturbance.

(b)     An owner of any premises subject to this article who is not also an occupant of the premises shall be responsible for any actions by tenants, guests, or other licensees that constitute second or subsequent violations of this article; provided, that no absentee owner shall be liable unless notified of first or previous violations of the article, and further provided that such first or previous violations shall have occurred within the previous twelve-month period. Notice of any first or previous violations pursuant to this paragraph shall be effected by registered or certified mail. No absentee owner may be subjected to criminal liability under this section, but shall be subject to civil penalties and equitable relief as provided in herein. This section shall in no way relieve any other person from responsibility for violations of this article.

(c)     The person responsible for any premises shall be responsible and liable for any violations of this article by tenants, guests, or licensees on the premises if the person responsible is actively or constructively present at the time of the violation.

Sec. 10-89.     Enforcement; penalties for violation; remedies; additional civil penalty for subsequent offenses.

(a)     Violations of the provisions of this article shall be subject to the civil penalties set forth in <u>City Code</u> Sec. 1-5(c). In addition to the penalties set forth therein, second or subsequent violations of the provisions of this article by the same person for the same activity occurring within one year of the first such violation shall be subject to civil penalties as follows:

Noise Ordinance 6-27-00           7

|  |  |
|---|---|
| First violation ............................... | $ 50.00 (per City Code Sec. 1-5) |
| Second violation ........................... | $100.00 |
| Third violation .............................. | $200.00 |
| Fourth or subsequent violation .......... | $300.00 per offense |

The penalties set forth above shall be incorporated into Appendix B, Schedule of Civil Penalties.

(b)     In addition to the civil penalties provided for above, the City may enforce the provisions of this article by appropriate equitable remedies as set forth in Sec. 1-5(d).

(c)     This article may be enforced by employees of the Asheville Police Department as designated by the Chief of Police, and by other employees of the City as designated by the City Manager. Animal control officers employed by the City, or employees of an animal control agency working under contract with the City for the enforcement of animal control ordinances, and who have been designated by the Chief of Police may enforce the provisions of this article relating to animals and animal noises."

Section 2.     That if any section, subsection, sentence, clause or phrase of this ordinance is, for any reason, held to be invalid, such decision shall not affect the validity of the remaining portions of this ordinance. The City Council hereby declares that it would have passed this ordinance, and each section, subsection, sentence, clause, or phrase thereof irrespective of the fact that any one or more sections, subsections, sentences, clauses, or phrases be declared invalid.

Section 3.     That all ordinances and clauses of ordinances in conflict herewith be and are hereby repealed to the extent of such conflict.

Section 4.     That this ordinance shall be in full force and effect on the date of adoption.

Read, approved and adopted this 27th day of June, 2000.

_Magdalen Burleson_
City Clerk

_Leni Sitnick_
Mayor

Approved as to form:

_[signature]_
City Attorney

Noise Ordinance 6-27-00                    8

57